The opinion of the court was delivered by
Nicholls, C. J.
In March, 1893, a contract was entered into between McEwen & Murray, Limited, a corporation owning and operating a saw-mill on the New Canal, in the city of New Orleans and the Gulf Lumber Company, by which the latter bound itself to haul and' tow the former’s saw logs from different points on streams emptying into Lake Maurepas, on said lake through Pass Manchac, on Lake Pontchartrain, into the New Canal to the saw-mill of the owners.
For the purpose of towing, the practice has been to bind ten or twelve logs together by chains into what are known as “ cribs ” and to construct a raft with them by chaining a number of these cribs together. The raft is then fastened securely to the steamboat by which they are to be conveyed. In April, 1893, when one of these rafts was being conveyed by a towboat of the Gulf Company to the city of New Orleans, the boat, when at a point on Lake Pontchartrain about a mile and a half from the mouth of the New Canal, encountered in the night-time a violent storm. Its severity was such as to *1189 ■cause the raft to break loose from the boat and get beyond the reach ■of her crew. Before morning it had disappeared from view. The raft finally broke to pieces, some of the cribs retaining their forms, ¡but most of them separating, and the logs of which they were composed scattering in different directions along and across the lake. At what precise time and place the raft broke into pieces does not •clearly appear. Many of these logs, and also a number of the cribs, were subsequently found in different localities miles apart, either grounded upon the shore or upon the sand bars in the lake, which run parallel to the shore at some distance out from it, or lying in the shallow waters between those bars and the shore. The Gulf Lumber ■Company did not attempt until some time after the storm to ascertain what became of the raft and its different parts. They finally, however, at different dates between April and the 1st of October, •sent out steamboats properly manned and with proper appliances to recover the logs and cribs, if possible. Outside services were also ■called into requisition.
Although many of the logs were recovered by these operations, a portion of them remained still in the lake and upon its shores on the last mentioned date. A part of those were doubtless in frontof the revetment which the plaintiff company had built for the protection of their roadbed, and which was constructed at no great distance from •the lake shore. On the first of October an exceptionally violent storm •occurred, which caused the waters of the lake to rise and to beat in -an extraordinary manner upon the shore in front of the plaintiffs’ revetment. The direction of the wind and waves was such as to drive logs which were in the lake in the vicinity of the plaintiffs’ revetment upon it and to batter it down in a number of places, not ■only injuring the revetment and necessitating its repair, but also injuring the embankment by the washing, of the waves upon it through the open spaces of the broken revetment.
Affer the damage had been done a correspondence took place between the plaintiff company and the defendants in reference to a number of logs which, the former asserted, “ drifting in Lake Pontchartrain, had floated against their revetment work and their embank - ment, between Little Woods and the city, where they were a menace the revetment in case of another storm.” The plaintiffs wrote that they had been informed that the logs, belonged to McEwen & -Co., Limited, That if such was the fact they asked McEwen & *1190 Murray to remove them at their earliest possible convenience. The plaintiff company also wrote to the defendants claiming that the injury already done to the revetment and embankment had been caused through the negligence of McEwen & Murray and that of the Gulf Lumber Company by logs belonging to the former, notifying them that they proposed to repair the damage done, and to hold both defendants responsible for the cost of repair. The repairs were afterward made, and it is admitted that the amount claimed is correct, if it be legally due.
The Gulf Lumber Company replying to the letters written by the plaintiffs in relation to the logs then on the lake shore, stated that all the logs branded “ M ” belonged to McEwen & Murray, but were in the writer’s care until they got them at the mill. That the logs which were scattered from Milneburg to the railroad got away from them during a high sea, and that so far they had been unable to get them — that they were then getting a small boat in readiness with which to get them off and that they expected to get them off in the next ten or fifteen days. They denied that the logs had gotten away from them by negligence, and asserted that their getting away had entailed loss on them.. In February of 1894, McEwen & Murray wrote the plaintiffs in reply to a letter written on the 30th of January, 1894r that the Gulf Lumber Company had been unable to get the logs on the Northeastern tracks, on account of boats being broken and also-low water.
That they would go over there in a short time and get them off; that the matter would receive their close attention. On the 1st of February, 1894, the Gulf Lumber Company wrote the plaintiffs that “they had gone down and made an effort to get the logs, but the water was so shallow they could not reach them, but that as soon as they got high water they would be after them, for they wanted them badly.” On the 3d of February the plaintiffs wrote the Gulf Company that unless they indicated a reasonable time within which they would undertake to remove the logs which threatened the revetment, the railroad company would be forced to relieve their works of the threatened danger at the expense of the Gulf Company. That situated as the logs were they would again very seriously damage the revetment in case of a storm. That while it was true it would be less expensive to remove the logs during high water than at the then stage of water, the risk of damage to the plaintiffs’ works should be *1191 taken into consideration. They, therefore, called on the company to inform them positively whether they' would remove the logs within a time which they would indicate and fix.
On the 9th the Gulf Company announced, that it would be impossible for them to remove the logs at that time or to name a date when they would do so; that all that they could say was that they were very anxious to have the logs, and that as soon as thé water would permit a boat not drawing over four feet of water to get within 800 feet of them, they would do so. ;
■ On the 12th the plaintiffs notified the Gulf Lumber Company that unless the logs lying in front of the revetment which protected their ■tracks were removed by the 1st .of March,-they would, in order to protect their works against the damage which would inevitably follow from the logs being thrown against the works by a storm or high water, cut up and remove them at that company’s risk and expense, and that they would hold them responsible for any damage that might occur in the meantime. On the 15th of the month the attorney of the Gulf Company wrote plaintiffs that their client had, since a portion of their logs had been blown by the terrific storm which swept over this portion of the State in September (October) in the proximity of the railroad company’s revetment, made three serious efforts with all the means at their command to reach and remove the logs, but that owing to the stage of the water at that point their attempts had been unsuccessful. They suggested to the plaintiffs that as they had better access to the logs than their clients had, they might be cut up into useful materials. They therefore proposed to the plaintiffs to sell them the logs at a price much below their real value as saw-logs. Plaintiffs declined to make the purchase, but stated that if the logs could be cut up into such lengths as would be useful and available to the Gulf Company, they would receive any suggestions which ■ that company would make to that effect. On the 23d of February'plaintiffs’ attorney wrote to defendants’ counsel a letter substantially to the same effect, stating additionally that unless the logs were removed by the 1st of March the railroad company would be compelled to have them cut up and removed.
This letter was followed by a reply from defendants’ counsel in which after referring to the declaration made that the plaintiff would, after the 1st of March, cut up and remove the logs, they said, *1192 on behalf of their clients that they earnestly protested against the cutting up of their logs by the railroad company or any person acting under their orders or authority; that before doing so their attention was directed to the provisions of Act No. 104 of 1892, and that their clients intended to prosecute all offenders under the terms of that statute.
We find nothing in the record which justifies a charge of negligence in the Gulf Lumber Company in losing their logs on the night of the 10th of April. We think “ their loss was occasioned by accidental and uncontrollable events” without their fault, and that under the terms of Art. 2754 of the Civil Code they were absolved from liability at that time and for that fact.
Plaintiffs contend that it was the duty of the defendants to have immediately followed up the raft and secured it.
Had any loss or damage resulted to third parties at that time by reason of the rafts being adrift, when by proper and timely efforts they could have been recovered, we would have been called on to say whether, under the circumstances shown to have then existed, the company were under legal obligation to take the course which plaintiffs maintain it was their imperative duty to have followed, or whether they were entitled to invoke the same rule which is laid down in reference to the owners of vessels sunk through unavoidable accident in navigable waters. We find it announced that “ where a vessel is sunk through an unavoidable accident in navigable water, the owner is not obliged to remove the wreck, nor is he liable for injuries it may cause to others, nor indictable for maintaining a nuisance, although navigation is obstructed.” Am. and Eng. Ency. of Law, verbo “Wreck,” page 995; 1 Ed. Sherman and Redfield on Negligence, Vol. 2, No. 738.
There is no one before us claiming to have received injury or to have been damaged at that time by a failure of the Gulf Company to take immediate steps to ascertain what had become of the detached raft, and there is nothing which would authorize us to say that if such steps had been taken that the ra,ft could have been then found, or found under such conditions as would have brought about a result different from that which actually occurred. Plaintiffs contend, however, that even if defendants were not originally liable for the damages which would follow from the situation and condition of the different parts of the raft at a later date, they have made them *1193 selves so liable by reason of tbe fact that instead of abandoning the cribs and logs, they have insisted upon their continued ownership of the same. They invoke on their behalf the principle doctrine announced in the concluding sentence of the extract from the American and English Encyclopedia of Law; which we have quoted, and which is to the effect that “if the owner, instead of abandoning the wreck, retains possession, he is liable for any injuries arising from his failure to take proper precautions for the public safety.” See Sherman & Redfield on Negligence, Vol. 2, No. 738.
Plaintiffs refer us to Secs. 1614 and 1615 of Domat’s Civil Law (Cushing’s Edition), where, under the chapter in which the author deals “ Of the consequences of the engagements which are formed by accidents,” he says: “The proprietor of a ground on which is thrown the rubbish of a building that is fallen down, or that which a flood has carried away from another’s ground, is obliged to suffer him who has had the loss to take away what remains and to allow him such free access as is necessary for that end, but upon the conditions that are explained in the following articles ” (Sec. 1614) :
“ In the cases of the foregoing article he who desires to have back the materials of his building that is fallen down or that which a flood hath carried away from his land and thrown upon another’s ground is obliged, on his part, not only to indemnify the proprietor of said ground as to what damage shall happen to be done by his taking away the things which have been-thrown upon it, but he is, moreover, bound to repair all damage which has already been done to the ground by the things since they were cast upon it. But if he choose rather not to take away anything he will owe nothing, for if he abandons to the proprietor of that ground all that is cast upon it, he is not bound to make good a damage that has happened by the bare effect of that accident, and it is enough that he loses what the accident has carried away from him.” (Sec. 1615.)
“ If he whose materials or other things have been thrown by these accidents on the estate of another person be desirous to take them away he will be obliged beside the making of reparation for the damage sustained by the owner of the ground to take'away as well the unprofitable stuff that can be of no manner of use as that which is useful, and which he is desirous to take away and to clear entirely the surface of the ground on which the things have been thrown.” (Sec. 1616.)
*1194 We will refer to this particular matter later. Eor the present we go back to an examination of the conduct of these defendants in the interval between their first discovering traces of the missing raft, up to the date of the storm of October 1, 1893. It was unquestionably not the intention of the defendants to surrender their ownership of the logs which had scattered, which they could locate and identify. They made very sincere and earnest efforts to recover and save them, not on account of any danger to be apprehended to-special individuals or to the public generally by rpason of their situation, but because of the value which they were deemed by the owner to have relatively to the expense necessary to redeem them. We take it for granted that had they been of the opinion that this value would not have justified any attempt at all at their recovery,, none would have been made, but they would have been abandoned. Also that they never intended that an attempt would be made to retake logs found which were, on examination, ascertained to be in such a special condition as not to warrant the expenditure of the money needed to accomplish it. We think it can be fairly assumed that while not abandoning for the time being any of their property, the owners proposed to ultimately abandon such portions of it as could be secured only by an unreasonable outlay of money. While we think it might have been possible at very great expense and by the taking advant ge of special stages of water and wind to have removed all the logs by boat, we do not think the situation was such that the owners simply as owners could have been reasouably expected to have taken any more active steps than they did toward regaining the logs. They might perhaps have been brought into the shore and there cut into pieces as was suggested at one time, but-defendants were engaged in the business of operating a saw-mill and not of selling wood, and the logs would have had but little value to them when cut up. In dealing with the acts of the defendants in this matter we have, therefore, to ascertain whether, independently of any question of value and expenditure, they were under a legal obligation for the safety of either special individuals or of the public generally to do more than they did in the premises. Defendants were not at fault for the escape of the raft. They had no agency whatever in respect to the particular places where the cribs and logs were lodged by the winds and waves, nor in determining the particular conditions in which they were there lodged. If for the conditions *1195 existing at the time of the October storm they were liable at all, it was not for acts of commission, but of omission.
The conditions per se were not such as to lead any one to look forward to probable danger or damage in the near future. Even the possibility of danger was remote. The conduct of the plaintiffs prior to the storm indicates no apprehension by them of damage likely to arise from logs on their immediate front. Had they entertained such apprehension they would have called upon the defendants earlier than they did or themselves taken the initiative, and removed the logs, taking the risk of recovering the expense therefor from the defendants. They certainly would not have allowed the comparatively small expenditure which they would have had to make to stand in the way of a threatened serious danger. The correspondence which followed the storm might be pertinent on a claim for future damage, but it has little effect in disposing of matters in the past.
In considering the question of the liability of the defendants to the plaintiffs for not actually and actively removing the logs from the lake front prior to the storm, the plaintiffs must bear in mind that they took upon themselves certain risks in placing their roadbed and revetment where they did. Their position, where placed, was of course legal, but none the less they were exposed from necessity to the possibility of just such a condition of affairs as happened. The lake has constantly upon it drift-wood and logs (reaching it from streams which run into Lake Maurepas through Pass Manehac) . The precise point at which these logs and this drift wood may be when a storm arises is a matter of pure accident-, as is the precise point where they may be during the storm and at its close. The particular logs which may batter down plaintiffs’ revetment during a storm need, by no manner of means, be those which are on its front at its commencement; those may be carried out either to do a work of destruction elsewhere or none at all. The result would be a matter of chance dependent upon the violence of the wind and its particular direction. The presence of logs on the front may under extraordinary combination of circumstances add to the danger of the situation, but we think we can say from the evidence in the record that this danger would be only exceptional. Plaintiffs’ revetment has been in front of their embankment since 1886, without serious, if any, injury to it. Nothing but a storm of the extraordinary character of that of the 1st of October, with its special accompanying condi *1196 tions, would bring about such a result as tbe plaintiffs complain of. The District Judge in his judgment, referring to it, said: “The storm of October was not an ordinary storm such as an ordinarily prudent man would expect and be bound to provide against. Upon the contrary it was a most extraordinary storm, the equal of which in fury and destructiveness has never but once been known or heard of in this country — an event of such infrequent and remarkable character that even prudent men can not be held as negligent for failing to make effective provision against it. If instead of leaving logs grounded in front of the revetment there had been heavy flatboats or other vessels moored there and secured as ordinarily prudent men would secure such craft, the result, in all probability, would have been the same; ordinary fastenings would have been of no avail as against the phenomenal gale of October 1, and the boats would have been converted into implements of destruction just as the logs were.”
“ Negligence consists in a failure to provide against the ordinary occurrences of life, and the fact that the provision made is insufficient as against an event such as may happen once in a lifetime, or perhaps twice in a century, does not, in my opinion, make out a case of negligence upon which an action in damage will lie.”
We do not think that as a matter of law defendants were guilty of negligence per se in not removing the logs from the lake shore prior to the 1st of October. To hold them negligent (if at all) the attendant facts and circumstances of the case would have to be shown so as from all the facts it could be seen that defendants were in fault. Plaintiffs do not claim that if defendants had absolutely abandoned the logs, fnot being in fault in losing them at the beginning] they m uld have any recourse against them for damages. They charge that the storm of October found a certain condition upon its immediate front, for which condition defendants were responsible by reason of their claim of the ownership of the logs, and of their being held as such owners to a legal obligation to safeguard it and the public against all dangers to result from their situation. The raft did not remain in its entirety. The logs of which it was composed were scattered for miles along the shore. The defendants can scarcely be said to have retained possession of them or to have held possession of any logs other than the particular ones which they might be attempting to remove, and then only so long as they were *1197 working to that end upon them. It was impossible that they should retain any greater possession or longer possession of the same than this. It was impossible for them to guard them in the lake. We do not think that by directing their attention to such logs as admitted of being removed and removing them, defendants bound themselves for the removal of such as could be removed only by extraordinary methods and at unreasonable expense, either absolutely or within any special time. We think they were authorized to abandon, as we have no doubt they always intended to abandon, such as could be removed only under such circumstances.
Defendants never claimed the logs which were thrown inside of defendants’ revetment upon their embankment, or upon any of their lands. Those which were cast upon their land are there yet unclaimed, so that the passage from Domat finds no application in the facts of the case. We think that" defendants’ efferts in the direction of removing the logs (if it was their duty to do so) were as great as could be expected and made as promptly as could be expected. (Sherman & Redfield on Negligence, Vol. 2, No. 738.) They are chargeable with no act of omission or of negligence for which they can be made legally answerable in damages to the plaintiffs.
In Hanson vs. Railway Co., 38 An. 117, this court declared that negligence, in its common acceptation, was held to be “ the doing of something that a reasonable and prudent person would ordinarily not have done under the circumstances of the situation or the omission to do something which a person of like character would have done under the circumstances of the case.”
The Supreme Court of the United States in Railroad vs. United States, 95 United States, 441, gave to the term substantially the same definition, adding “ that the duty was dictated and measured by the exigencies of the situation.” In order to render a person chargeable in damages for an act of omission or commission on his part the act complained of must have been the proximate cause of the damage.
In Hubber vs. La Crosse City Railway Co., the Supreme Court of Wisconsin, affirming what had been previously declared by it in Block vs. Railway Co. (61 N. W. 1101), said: “The negligence is not the proximate cause of the accident, unless under all the circumstances the accident might have been reasonably foreseen by a man of ordinary intelligence and prudence. It is not enough to prove *1198 that the accident is the natural consequence of the negligence. It must also have been the probable consequence. Atkinson vs. Transportation Co., 18 N. W. 764; Barton vs. Society, 52 N. W. 1129; McGowan vs. Railway Co., 64 N. W. 891.
‘‘A mere failure to guard against a result which could not have been reasonably anticipated is not actionable negligence.” A condition is ordinarily a remote cause and it was so in this instance (see 67 N. W. 19).
We are of the opinion that the judgment is correct and it is hereby affirmed.