Plaintiff claims that while she was a patron in the Saenger Theatre, a large moving picture house in New Orleans, she sustained serious physical injuries when, as she was descending an aisle stair in the balcony, her left foot was caught between the end standard of a row of seats and the end of one of the steps of the aisle. She charges that the design of the seats and stairs was improper in that between the end of each row of seats and the tread of the step there was left a small open space in which the foot of a patron descending or ascending might be caught, and she also charges that the lighting in that part of the theatre was defective and that, as a result, she could not notice that there were such "foot traps", as her attorneys designate these open spaces.
Defendants, Paramount-Richards Theatres, Inc., the operators of the theatre, and American Mutual Liability Insurance Company, their liability insurance carrier, deny that there was anything improper about the design or construction of the theatre, or about the lighting system, and they aver that the entire theatre, including the lighting system, had been designed by and constructed under the supervision of an experienced architect, who had first made an exhaustive study of other large moving picture theatres and other large buildings, and who had designed many such large structures. Defendants also aver that "since the opening of said theatre thousands of persons have entered and left and do enter and leave seats in the balcony of said theatre daily by way of said stairway without any other person, to the knowledge of these defendants, having suffered a fall or having been injured by reason of said small spaces between the iron supports on the sides of the seats at the ends of the rows of said seats and the ends of the concrete steps, and that, therefore, this stairway and the arrangement of said seats was and is a safe one."
Defendants further raise the inference that the accident to plaintiff did not, in fact, occur in the theatre, pointing out that on *Page 240 
that night no report thereof was made to any of the attendants.
And, finally, defendants in the alternative aver that if plaintiff was, in fact, injured in the theatre, and if there was anything defective about the design of the building or about the lighting system, the true cause of the accident was the contributory negligence of plaintiff, herself, "in failing or neglecting to watch where she was going and to take proper care while descending said stairway."
There was judgment below for plaintiff against defendants, solidarily, for $6,000, and both have appealed.
We readily conclude that plaintiff's injuries were sustained in the theatre, and on the night in question. The mere failure to report the accident is an incident which cannot overcome the effect of the positive testimony of three persons, plaintiff, her son and her daughter-in-law. Doubtless the seriousness of the injury was apparent and, probably realizing its severity, they gave no thought whatever, at that time, to the making of a report or complaint but devoted all of their efforts to reaching a hospital as soon as possible. The questions then are: Was there anything about the construction of the theatre or about the lighting system which justify the conclusion that a reasonably prudent theatre operator would have made changes therein, and, if so, was plaintiff, herself, at fault in not exercising proper care to see where she was walking?
On the night in question, May 24th, 1940, plaintiff, her son and her daughter-in-law went to this theatre, and after obtaining tickets, entered and ascended to the balcony. They walked from the front, or lower row, to Row "F" and there occupied seats for approximately 2 or 2 1/2 hours, witnessing an entire performance, and possibly part of a second one. As they left their seats, plaintiff's daughter-in-law descended the aisle stairway first, her son next, and then plaintiff, herself. She says that as she was attempting to put her foot upon the tread of the step, adjacent to the seats in Row "D", this foot (the right one), instead of striking the stair, was placed so far to the right that it was caught between the end of that step and the standard or support of the adjacent seat, and that she fell into a sitting position, her right foot being caught between the seat and the step and her left leg extending forward so that her left foot was under one of the seats in Row "C". In some unexplained way, she sustained "a fracture of both bones to the ankle joint, (left) known as a Potts' fracture."
Her son obtained help from two other patrons of the theatre, and they carried plaintiff to the foyer on the main floor whence she was taken to the hospital.
Plaintiff's assertions that defendants are liable to her are based, as we have said, on the charges that the design of the theatre was defective in that there was a "foot trap" between the end of each second row of balcony seats and the end of the adjacent step, and in that there was insufficient lighting at the point at which she fell.
The balcony contains slightly more than 1,300 seats. It is so constructed that the rear is considerably higher than the front, the rows of seats being placed on tiers, each approximately 12 inches higher than the one in front of it. These tiers continue from one side of the theatre to the other. There are aisles by means of which the patrons pass from the lower to the higher tiers and vice versa. Each tier being about 12 inches higher than the one in front of it, it is necessary that in the aisles there be intermediate steps, as a person cannot comfortably negotiate steps as high as 12 inches. These intermediate steps divide the height of the tiers equally so that there is a continuous stairway in each aisle from the front to the rear. Each row of seats is placed on a tier but the end seat does not touch the end of the intermediate step, there being a small space between the standard of each end seat and the intermediate step. This space is 2 1/2 inches wide at the rear and 3 3/4 inches wide at the front. There is an arm rest on each seat which protrudes slightly beyond the standard of the seat and thus extends partially over the open space mentioned. This arm rest is 18 or 20 inches higher than the top of the intermediate step.
The theatre was designed by and constructed in 1927, under the supervision of Mr. Emile Weil, one of the well known architects of New Orleans, who, prior to making the plans, visited many of the leading theatres in the United States, and who designed the Tulane Football Stadium, the Canal Building and many other very large structures.
It is shown that about 6,500,000 people occupied seats in the balcony in this theatre between the time of its opening in February, 1927, and the night in question, May 24th, 1940, and had made use of these aisles, *Page 241 
and that no other accident involving these so-called "foot-traps" had ever been reported.
As against the testimony of Mr. Weil, who obviously thought that there was nothing dangerous about the design of the theatre or about the lighting, and against the fact that there had been no similar accident before, we find the testimony of two experts placed on the stand by plaintiff, Mario G. Zervigon and Gordon Frick, both of whom thought that the openings were dangerous and that the lighting was very defective.
We cannot avoid the impression of extreme partiality made by the testimony of Mr. Frick. During the giving of his testimony, although his sincerity was not questioned, he, on more than seven occasions, volunteered such statements as
"Of course, I am absolutely disinterested in the case, I am just giving impartial testimony here as a qualified engineer."
"I am not trying to knock anybody."
"* * * I am not knocking. I am an engineer."
"* * * it is my privilege to walk down here. I am not prejudiced, I am absolutely neutral in this case."
"I am impartial, telling you what I found * * *."
He obviously thought that the theatre was extremely dangerous and, in fact, said that although he was there for the purpose of taking measurements and studying conditions, there were such irregularities that he, himself, "almost stumbled" and that although he "became used to the tread" he "almost fell."
If the theatre was so dangerous as he would have us believe, it would seem to be quite remarkable that there were not more such accidents.
It is shown that in the other large moving-picture theatres in New Orleans there is no such space as is found in the balcony of this theatre. But Mr. Weil explained that difference by saying that the width of this theatre and the necessity for servicing the seat standards made it necessary in his design and, he added, that while possibly it would have been safer had covers of some kind been placed over these openings, he considered this theatre quite safe.
The evidence as to whether in that part of the theatre the lighting was adequate is quite conflicting. Mr. Zervigon described the rather exhaustive tests which he made and said that he used the most modern light meter and that this meter indicated that the lighting was very deficient when compared with the standards recommended by the laboratories of several of the large manufacturers of electrical equipment. In fact, he said that the lighting "was between eighty and ninety per cent short of the generally recommended value", yet he frankly said that he, himself, had been in the same balcony and that though he had had some little difficulty "when I would first come into the theatre", he had had no particular difficulty in leaving.
Mr. Frick, the other expert, was likewise of the opinion that the lighting was very defective. He said: "I went there with my little photo-meter and the light was so weak it didn't even register."
It is shown by Mr. Zervigon that there are aisle lights shining downward "located on the sides of the seats every fourth row staggered." However, Mr. Frick said that though these lamps on the ends of the seats threw a certain amount of light directly downward and threw some light across to the other side of the aisle, they threw no light at all on the near ends of the intermediate steps. He also said that at the time at which he made his tests the lights "had a very high depreciation factor" because "this one was covered with dust". He did not say which light he meant and, as a matter of fact, his tests were made nearly eighteen months after the occurrence of the accident.
According to these two experts, the lighting was so defective that we cannot understand how anyone could safely have made his way around in the theatre.
It is well known that the lighting in moving-picture theatres is always kept dim so that it will not interfere with the proper viewing of the picture and if this light, which it is conceded should have been very low, was from eighty to ninety per cent deficient, we cannot see how it would have been possible to move around in the theatre at all.
In spite of the opinion of these two experts that the lighting was so defective, Mr. Weil, the architect, who, as we have said, has had a great deal of experience in the construction of large buildings and who had visited many other large moving-picture theatres, stated that the lighting in this theatre was standard, and Mr. Carter, the secretary of the defendant company, who had been in the moving-picture theatre business since 1909, said that his company operated *Page 242 
more than fifty theatres, and, with reference to the lights in this theatre, he said:
"The lights there are standard practice with us in the theatres we operate."
Plaintiff, herself, gave rather interesting testimony indicating ability to see at least reasonably well when even she first entered the theatre, and it is conceded that in such theatres a patron's ability to see improves considerably after becoming accustomed to the semi-darkness. She said that when she entered, she went up the stairway to Row "F", and added:
"We noticed it when we were going up, the numbers on the seats."
Later she attempted to avoid the effect of this admission by saying: "We couldn't see the numbers; of course not", and then she added: "I noticed I was up high, and I know that is the way they run", and then later she added also that she had been shown to the seat by an usher.
But we are most impressed by the fact that the lighting and the seating arrangement were just what they had been for nearly fifteen years, and it is very obvious that within that time, if they had been so frightfully defective, some other accident would have occurred, or surely the deficiency or defect would have caused comment or complaint and any such deficiency or defect could easily have been remedied, if, in fact, any actually existed.
We find a very interesting discussion of the problem of how much light moving-picture operators should permit in their houses in Falk et al. v. Stanley Fabian Corporation of Delaware,115 N.J.L. 141, 178 A. 740, 741, in which the Court said:
"A moving picture house necessarily operates in partial darkness. With a flood of diffused light, there would be no picture. On the other hand, if there were absolute darkness, entrance and exit of patrons during the showing of a picture would be practically impossible. There is a wide range between these two conditions. To provide too much light is to spoil the entertainment for the patron. To provide too little is to impede or make dangerous his coming and going. Where is the line that marks ordinary care? Is it to be determined in each specific instance as an isolated fact without regard to standard equipment or prevailing practice? We think not. Grave difficulties would attend such a course, for it appears that the degree of illumination must be something of a compromise between two opposing objectives — successful showing of the picture, which calls for darkness, and the safety of those for whom the entertainment is provided, which calls for light. The misadventures that may befall persons moving about in a darkened room are legion both in number and in variety of incident. It has been held that a moving picture operator violates no duty to a patron if, while a picture is being shown, the condition of light is that ordinarily used in exhibiting moving pictures to enable the audience to get a reasonably clear view of the image thrown on the screen. * * *"
In Gunn v. Saenger-Ehrlich Enterprises, Inc., et al., 192 So. 744, 745, the Court of Appeal for the Second Circuit in discussing the same question said:
"It is evident that a motion picture theatre, from the very nature of its business, while a picture is being projected, is not required to provide lighting in its auditorium, balcony and galleries of sufficient illumination to allow its patrons to see their way to, locate and occupy seats as is the case in other places of public amusement. The reason for this is obvious. To do so would necessarily interfere with the satisfactory projection of the picture on the screen, thus depriving patrons of the benefit of that for which they pay admission to see. There is, however, a duty upon the theatre management to furnish as much light as may be consistent with its duty toward its mass patrons."
And the same court, in McKelvy v. Capitol Amusement Co., 159 So. 143, 145, found a situation very similar to that found here so far as lighting was concerned, and pointed to the fact that the patron, on entering the theatre had had no difficulty at all in finding her seat. There the court said:
"The effect of the allegation that the balcony was so improperly lighted that it was impossible for petitioner to make her way from the seats to the dressing room is destroyed in the petition itself, which shows that plaintiff came into the theatre, ascended the stairway leading to the balcony, and found a vacant seat without trouble. * * *"
The law with reference to the duty owed by a theatre operator to a patron is stated in Givens v. De Soto Building Co.,156 La. 377, 100 So. 534, 536, wherein the Supreme Court said:
"Now the operator of a theatre is not an insurer of his patrons. He need only be free from negligence; and, granting that a *Page 243 
prudent man must exercise some degree of foresight, nevertheless he is not required to foresee that something may happen, when long experience fails to show any such happening before, unless the circumstances are such that he should have known that the happening was likely even though it had not yet occurred."
In Mahfouz v. Southern Amusement Co., 3 So.2d 458, 460, the Court of Appeal for the Second Circuit said:
"It is well settled in the jurisprudence of our State that the operators of theatres are not insurers of those patronizing them. They are only required to exercise reasonable care for the protection of their patrons against injuries. Jackson v. Saenger-Ehrlich Enterprises, La.App., 175 So. 688; McKelvy v. Capitol Amusement Company, Inc., La.App., 159 So. 143; Doell v. St. Charles Theatre, La.App., 159 So. 401; Givens v. De Soto Building Co., 156 La. 377, 100 So. 534; and McGregor v. Saenger-Ehrlich Enterprises, La.App., 195 So. 624."
In West v. Seigle Theatre, et al., 200 So. 339, 340, the same court had stated the same rule as follows:
"The standard of care due by operators of theatres and movie shows to their patrons, in this state, as well as in others, is definitely fixed by scores of court decisions. The general rule is that the highest degree of care is not exacted; reasonable or ordinary care meets legal requirements. As a corollary, it follows that the operator of such a place is not the insurer of the safety of his patrons."
The trial court gave reasons for judgment in which appears the following:
"The fact that an accident such as this had not happened before is no criterion that such an accident would not happen. The theatre company had a long time to repair and make this stairway safe the same as other concrete theatres in this community. They did not do so, and certainly this is not a fault of the plaintiff, but is one of the defendant."
The inference is that there is the duty in a theatre operator to foresee any possible accident. But this, according to the settled jurisprudence, is not required. The true test is not whether some unusual type of accident can possibly happen, but whether the possibility of such an accident is sufficiently great that it is proper to say that the operator of the theatre ought to have foreseen that possibility.
In New Orleans Northeastern R.R. Co. v. McEwen Murray, Limited, and Gulf Lumber Company, Limited, 49 La.Ann. 1184, 22 So. 675, 680, 38 L.R.A. 134, the Supreme Court expressed the thought which we have in mind as follows:
"Negligence consists in a failure to provide against the ordinary occurrences of life, and the fact that the provision made is insufficient as against an event such as may happen once in a lifetime, or perhaps twice in a century, does not, in my opinion, make out a case of negligence upon which an action in damages will lie."
The same idea has many times been expressed, notably in Carroll v. New Orleans Ry. Light Company, 132 La. 683, 61 So. 752, in Caillier v. New Orleans Ry. Light Company, 11 La.App. 93, 120 So. 76, and in Gaisser v. New Orleans Public Service, Inc., 6 La.App. 139.
In the Gaisser case the court said: "* * * Facts speak louder than opinions. For the many years during which the conditions complained of had existed, numberless passengers had entered the cars and not an accident was recorded."
In the Carroll case, the following appears:
"The place at which the plaintiff alighted was a reasonably safe place, as shown by the fact that many persons had made use of it without incurring harm. * * *" [132 La. 683, 61 So. 753.]
And in the Caillier case the rule is stated as follows:
"`Negligence' is the failure to use such care as is necessary to avoid a danger which should and could have been anticipated, by reason of which the plaintiff has suffered an injury.
"A defendant can only be required to guard against an anticipated danger.
"Evidence that no accident had occurred for a long time after the existence of a certain condition of things, and that none suggested itself to the mind, would justify the failure to anticipate possible danger."
When a theater is constructed by an experienced architect of recognized ability — and there can be no question about that here — and that architect, who has constructed other theaters, has constructed a theater which, for fifteen years, has failed to produce an accident of the type complained of, we think that there is raised a fairly strong presumption that the defect, if *Page 244 
there is such a defect, upon which plaintiff relies, does not present a danger sufficiently apparent to justify the conclusion that it is negligence to fail to eliminate it.
It seems obvious that the small space into which plaintiff says she put her foot is so far to the side of the aisle (which is about 36 inches wide) that because of the protrusion of the arm rest of the seat, while it is possible for the foot of a patron to go into it, such an occurrence can only take place under most unusual circumstances.
As is shown in the evidence, if we required any evidence, a person walking up and down an aisle, even on the very edge of it, will strike his arms or his hips against such an arm rest, when his feet are still some distance away from the edge. This is manifest also from the fact that several million people used these aisles without, so far as is known, any foot ever having been caught in this opening before.
Counsel for plaintiffs have cited many cases, in some of which the theater operator has been held liable, but in most of which it was held that there was no liability. Counsel seek to distinguish each of the cases in which defendant was exonerated and point to the few other cases as presenting situations analogous to that before us. But in each of those cases the court held that there was an actual defect and a condition which should have indicated danger to a reasonably prudent theater operator. We cannot find that this is true here.
In a supplemental brief counsel cite Fox West Coast Agency Corporation v. Forsythe, 9 Cir., 131 F.2d 629, decided November 18, 1942. There the court held a theater operator liable to a patron who was injured when a seat broke beneath her. The court held that though plaintiff, a woman weighing 285 lbs. was over the "average" in weight, her size was apparent to the ticket-seller who should have warned her of the insufficiency of the theater seats, if they were not sufficiently strong to sustain a person of that weight.
It is obvious that while, as the court said, a person of 285 lbs. is above the average, there are many persons who weigh that much and more and theater operators must know that often such heavy persons patronize their houses, and must, therefore, either provide seats sufficiently strong to sustain such persons or be on the lookout for them and refuse them admission. We see no such situation here. If many million people used the gallery of this theater and not one of them was "trapped" by these openings, there was no reason for the theater operator to suppose that this particular plaintiff might be caught. We cannot find any negligence here.
Accordingly, the judgment appealed from is reversed and plaintiff's suit is dismissed at her cost.
Reversed.