LEMMON, Judge.
Dixie Machine Welding and Metal Works,'Inc. the lessee of a 45-ton crane, and Employers Liability Assurance Corporation, Dixie’s partially subrogated insurer, filed this suit to recover damages sustained when the boom of the crane was struck by railroad cars being switched by employees of Illinois Central Railroad Company. By third party demand I.C. sought contractual indemnification, attorney’s fees and costs against Bunge Corporation, on whose premises the accident occurred. After a trial on the merits, judgment was rendered dismissing all demands. Dixie, Employers and I.C. appealed.
Since Dixie and Employers virtually admit on appeal that Dixie’s employees were contributorily negligent by placing the boom across the track without notifying Bunge or I.C., the principal issue is wheth *810 er I.C. was also negligent and had the last clear chance to avoid the accident.
Bunge operated a grain elevator on property which measured approximately 400 feet by 2,400 feet, fronting on the Mississippi River. At Bunge’s rear or north property line was the right of way for I. C.’s main line.
Pursuant to a 1960 gontract, I.C. had constructed spur tracks on Bunge’s property. At the time of the accident, I.C. received railroad cars destined for Bunge about three times per week. A switch engine crew transferred the cars from I.C.’s nearby yard to Bunge’s plant by moving them east along the main line and then switching them onto a lead track at the rear of Bunge property. The lead track curved gradually to the right (toward the River) off the main line. About 250 or 300 feet from the main line switch, but still in the curve leading away from the main line, the lead track branched into the four spur tracks. The spur tracks then continued in a gradual curve for approximately another 300 feet and finally straightened out and ran near and parallel to the east side property line, between the side line and the plant buildings, eventually terminating near the River Road.
About two weeks before the accident Dixie began installation of an elevator and other equipment on a storage unit, a tall structure located toward the front of Bunge’s property. Dixie moved the crane onto the job site, with the boom broken down in sections. In order to assemble the 200-foot long boom in cramped quarters, Dixie requested and received permission from Bunge to place the boom temporarily across a portion of the four I.C. tracks.[1] Dixie then operated the crane from a position assigned by Bunge behind the storage unit, well off the track. While the crane was in operation, the boom extended upward and away from the tracks.
On the day of the accident the crane operator noticed the cable was frayed. Dixie’s foreman instructed the operator to lay the boom across the tracks in order to take the weight off the cable and arranged for a replacement cable to be delivered. The boom thus obstructed the three tracks clos[1] est to the storage unit for a period between 1(4 and 2(4 hours.
At the time there was a string of 17 railroad cars on No. 1 track (closest to the storage unit), the car nearest the boom being about 150 to 200 feet away. Although the foreman set the hand brake on the first three cars on No. 1 track and placed a barricade on No. 3 track, he did not notify Bunge or I.C. that the track was obstructed nor did he send any of his men idled by the work stoppage to the other end of the cars to warn against movement.
While the boom was on the tracks, an I. C. crew pushed a string or “cut” of five cars from the main line onto the plant, pursuant to earlier instructions from Bunge. The rear car of the 17 cars already on No. 1 track was located about 75 feet from the switch off the lead track, at a point called the clearance point, so designated to indicate a point beyond which cars could be placed without blocking other tracks. Each car was 40 to 50 feet long. Thus the string of 17 cars extended from the clearance point toward the River for a distance of 680 to 850 feet.
Inasmuch as the switch on No. 1 track was located in the curve in an area of high grass, a person at the switch or at the clearance point could see only the top of the car nearest the River and could not see the track beyond that car. The boom, lying on its side, was four feet high and thus could not be seen from the clearance point.
The I.C. crew impact-coupled the five cars onto the 17 cars already on No. 1 *811 track. After checking the coupling and connecting the air brakes, the crew pushed all 22 cars at 2 to 3 miles per hour down the track toward the River until the last car had passed the clearance point. The crew then uncoupled the engine and left the premises, not realizing that the front car (closest to the River) had struck the boom. At no time during the ten-minute operation did any member of the crew go closer to the front of the plant than the point where the five cars were coupled with those already on the track, which was near the clearance point.
Members of the I.C. crew testified that they did not receive any notice or warning of the crane on the tracks and had no reason to believe that the track was obstructed. Since they knew No. 1 track held 28 cars and contained no crossings, they considered it unnecessary to check the tracks before pushing the 22 cars an additional five car lengths, or 200 to 2S0 feet, toward the River. In the years that the crew members had switched cars on Bunge’s property, none had ever before seen the tracks obstructed.
Nevertheless, the trial judge found I.C. negligent “in pushing a cut of cars without knowing what was in front of the cut.” The judge also found Dixie contributorily negligent and thus dismissed the suit by Dixie and Employers. We reach the same result, although we disagree that I.C. was negligent under the particular facts and circumstances of this case.
A railroad has the duty to use reasonable care in switching cars on spur tracks located on private property when the movement of the cars is likely to cause injury to persons or property. The crucial determinations of what constitutes reasonable care and of whether the movement is likely to cause injury must be made according to the facts and circumstances of each case. In discussing the duty applicable in this type of operation, the Supreme Court in Downing v. Morgan’s L. & T. Ry. and S.S. Co., 104 La. 508, 29 So. 207 (1900) stated:
“The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be gauged by what is called for by the circumstances of each case.” (p. 207)
See also Spiers v. Consolidated Companies, 241 La. 1012, 132 So.2d 879 (1961), a case involving a railroad’s duty of lookout, in which the court stated:
“ ‘A defendant can only be required to guard against a probable or anticipated danger. New Orleans & N. E. R. Co. v. McEwen & Murray, 49 La.Ann. 1184, 1196, 22 So. 675, 38 L.R.A. 134 * * *.’ Caillier v. New Orleans Railway & Light Company, 11 La.App. 93, 120 So. 76, 78.” (p. 883)
Dixie and Employers contend that the present case is controlled by Reeves v. La. & Ark. Railway Co., La., 282 So.2d 503 (1973). The accident in the Reeves case occurred on a spur track, which had been constructed on an oil refinery to service a coking unit. While a new coking unit was under construction, the track had been dismantled, but was reconstructed about six weeks prior to the accident. Trains traveling on the curving spur track in that area were signaled by a red and green light operated by the refinery owner.
While the new coking unit was still under construction, the lead car of an 18-car string being pushed by a locomotive struck a truck, which was being loaded at the new unit. The truck had been moved onto the track in order to permit relocation of a “cherry picker”, which was being used to load the truck.
The Supreme Court held the railroad negligent because “the train proceeded blindly into an area where an obstruction on the track could reasonably have been expected and foreseen.” (Emphasis supplied) The difficult issue in the Reeves *812 case was whether or not the plaintiff was contributorily negligent.
We do not believe that the holding in the Reeves case requires us to find the railroad negligent in the present case. In the Reeves case plaintiff’s truck had previously parked on the track for long periods of time and other trucks, bulldozers and cherry pickers had also parked on the track or crossed the track in connection with the ongoing construction activities. The railroad employees should reasonably have anticipated that the track might be obstructed and that movement without a lookout might cause injury to persons or property. Indeed, the fact that a signal light was necessary indicates that obstructions in the area were frequent and were to be reasonably expected. Blind movement under those circumstances violated the railroad’s duty to use reasonable care.
In the present case the tracks were located in an area which was only used for switching and storing railroad cars preparatory to the loading or unloading operations performed by Bunge. Photographs indicated that the premises were enclosed and that there were no operations or plant structures beyond the tracks, which were close to the trees and fence along the east property line. There were no crossings along the entire lengths of the spur tracks, and there was no apparent reason for any person or equipment to cross the tracks.
The I.C. crew knew (1) there was space to store 11 more cars on No. 1 track; (2) there were no crossings along the track; and (3) there was no reason for persons or property to ordinarily occupy or cross the track except for Bunge’s switch engine. They also knew that Bunge had always kept the tracks clear in the past or had notified them when the track was obstructed, and they were in constant radio communication with the I.C. yard master, who was available to Bunge by telephone.
Under these circumstances I.C. owed no duty to this particular party (Dixie) to be on the lookout for the obstruction which the crew had no cause to reasonably anticipate. Perhaps I.C. owed a different duty to Bunge, or perhaps I.C.’s duty to Dixie would have been different under different circumstances; however, we can only consider the facts and circumstances in the record before us. On that record we cannot conclude that this accident resulted from the breach of any duty that I.C. owed to Dixie.
Since we hold that no breach of duty by I.C. contributed to this accident, it is inappropriate to consider the argument of last clear chance, which applies only when both plaintiff and defendant are both guilty of actionable negligence.
As to I.C.’s third party demand, the pertinent contract provision reads:
“Shipper shall not erect or maintain, or allow to be erected, maintained or to exist any building, structure or physical obstruction of any kind adjacent to or over said Track at distances less than those prescribed by lawful authority; and, in no event shall any such building, structure, or physical obstruction be erected, maintained or allowed to exist within eight and one-half (8j4) feet of the center line of said Track or at a height of less than twenty-three (23) feet above the top of the rails of the Track, except as to wires, the overhead minimum clearance of which shall be in accordance with specifications of the current National Electrical Safety Code, and in no case less than twenty-seven (27) feet above the top of the rails of said Track. Shipper will hold and keep harmless the Railroad Company from all liability, loss, damage and cost, including attorney’s fees, for death of or injury to persons, including employees of the parties or damage to property including that belonging to the parties, in any manner or degree resulting from or arising out of Shipper’s failure to perform this covenant regardless of any negligence of the Railroad Company. Knowledge of or notice to Railroad Company of such fail *813 ure and its continued operation over the Track thereafter shall not be a waiver of this covenant.”
I.C. contends that Bunge is liable for costs and attorney’s fees (and would have been liable for indemnification had I.C. been held liable for the damages). We hold this contention unmeritorious.
The contract prohibits Bunge from creating or allowing an obstruction of the tracks. The “hold harmless” provision only applies when Bunge violates the contract in this regard. Bunge did not create the obstruction in the present case and cannot be deemed to have “allowed” the obstruction. After having instructed Dixie not to block -the tracks, Bunge was not actually notified when Dixie did so. Furthermore, considering the circumstances as to the location and the short duration of the obstruction, we cannot conclude that responsible Bunge officials should have known the track was blocked so as to give rise to an inference that Bunge allowed the obstruction.
The judgment is affirmed.
Affirmed.

. Tlie evidence was not clear as to the extent of permission granted, but it was clear that Dixie did seek permission from Bunge and that Bunge did notify I.C. of the temporary obstruction.