120 So.2d 511 (1960)
Kenneth A. RECTOR and Mrs. Joyce Rector, Plaintiffs-Appellee,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY OF HARTFORD, CONN., Byron M. Vernon and John S. Campbell, d/b/a Twin Cedar Trailer Park, Defendants-Appellants.
No. 4976.
Court of Appeal of Louisiana, First Circuit.
April 25, 1960.
Rehearing Denied May 31, 1960.
*512 Kantrow, Spaht, West & Kleinpeter, Baton Rouge, for appellants.
Joseph A. Gladney, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, TATE, LANDRY and FRUGE, JJ.
ELLIS, Judge.
On November 18, 1957, the plaintiff, Kenneth A. Rector, was renting from the Twin Cedar Trailer Park, space to park his trailer, and at about 11:30 A.M. during a wind and rain storm an elm tree estimated from two or three feet in diameter fell across the trailer causing certain alleged injuries to plaintiff, Mrs. Rector. The plaintiff, Mrs. Rector, filed suit for her alleged injuries and pain, suffering, consisting of injury to her back, fracture in the translucent lines in the right ramus of the pubis, shock, traumatic neurosis, anxiety, physical pain and suffering past and future, mental pain and anguish past and future, humiliation and embarrassment, personal inconvenience and attorney's fees. Kenneth A. Rector asked for damages to the trailer and for recovery of certain items which he as head of the community alone could claim and sue for their recovery.
Plaintiff alleged that the tree fell because it was diseased and defective; that plaintiffs were not warned by the defendants of the defective tree nor were they ever advised, informed or learned that the tree was defective prior to the accident; that the defendants, Vernon and Campbell, knew of the defective condition of the tree; that plaintiff's rental contract entitled them to receive and expect a safe place to locate their trailer, and that the defendants, Vernon and Campbell, violated the rental agreement in failing to provide a safe place; that they are entitled to recover from the defendants, Vernon and Campbell, their damages, losses and expenses as itemized in the petition under the provisions of LSA-Civil Code, Article 670, 2322 and 2695; in the alternative plaintiff plead that they were entitled to recover under the provisions of the LSA-Civil Code, Article 2315.
The defendants admitted renting a space to the plaintiffs for the location of the trailer; defendants deny that they are guilty of any negligence whatsoever, either causing or contributing to the alleged accident and the resulting damages; that the tree referred to in the plaintiff's petition blew down during a terrific storm and was not defective; that alternatively that if the tree were found to be defective, that there was nothing in connection with the appearance or nature of the tree which would lead any person to believe or suspect that said tree was defective in any way, and consequently, the defendants had no way whatsoever to know or even suspect that the tree contained any defects whatsoever, it being to all appearances a strong, healthy and sturdy tree; that the failure of the tree to remain standing was not caused by any negligence of any kind on the part of any of the defendants, but on the contrary was the result of an act of God and the uncontrollable forces of nature which were completely unforeseeable and uncontrollable by any of the defendants and, consequently, the defendants were guilty of no negligence whatsoever, either causing or contributing to the cause of the fall of the tree and the resulting damages; in the alternative, the defendants plead contributory negligence on the part of the plaintiffs; in the further alternative the defendants plead the assumption of risk on the part of the plaintiff and that they had the last clear chance to have avoided the *513 accident and resulting damages, in that they had full knowledge of the terrific storm in progress and that there are certain dangers attendant upon placing one's self or property directly beneath such a tree and that plaintiffs had ample time and opportunity prior to the occurrence of the accident to remove themselves from such a position of danger.
After trial before a jury for approximately five days and the hearing of sufficient testimony to constitute a transcript of evidence containing 778 pages, the jury returned a verdict in favor of the plaintiffs, Kenneth A. Rector, in the sum of $2,400 with interest, and in favor of Mrs. Joyce Rector in the sum of $8,000 with interest. By stipulation all defendants except the Hartford Accident and Indemnity Company of Hartford, Conn., the insurer, were relieved of the effect of the judgment and from this judgment it has appealed. The plaintiffs have answered the appeal asking a review of the trial court's ruling in refusing to permit them to prove attorneys fees as an element of damages in violation of the rental contract based on the bad faith of the defendant; also they state that they are aggrieved at the amount awarded Mrs. Joyce Rector as being manifestly inadequate and ask that it be increased to the sum of $27,600; that plaintiff Kenneth A. Rector was aggrieved in that the award to him was inadequate and should have been $3,902.24 including attorneys fees and asked for such an increase on this appeal.
The main defense relied upon by defendant in this case consisted of the contention that this accident and resulting damage was the result of an act of God, for which the defendants, Vernon and Campbell, would not be liable under the law of Louisiana, and for which the defendant, Hartford Accident and Indemnity Company, could not be liable because of the fact that an accident caused by an act of God forms a specific exclusion in the insurance policy issued to the defendants.
The plaintiffs counter with a denial that the storm was not of sufficient force or violence under the proven facts to be classified as an act of God in relation to the cause for the tree having been broken eight to ten feet above the ground and falling on the plaintiffs' trailer. Plaintiffs further contend that even though the falling of the tree could be considered as having been caused by an act of God, that when such an act combines or concurs with the negligence of the defendant, the latter is liable if the injury would not have resulted but for his own negligence, conduct or omission, and that in the present case the defendants, by the exercise of reasonable care and foresight,[1] could have prevented the accident.
The law and the jurisprudence which define an act of God as applicable where such an act produces an injury is clear and well settled, as is the law and jurisprudence, in cases where there is a concurring negligence combined with the act of God which produces the injury. Plaintiffs and defendants in their excellent briefs have cited the law applicable to the contentions above outlined, some of which are relied upon by both parties, and we quote:
"The concurring negligence which when combined with the Act of God produces *514 the injury must be such as is in itself a real, producing cause of the injury, and not merely fanciful or speculative or microscopic negligence which may not have been in the least degree the cause of the injury. In other words, if the Act of God is of such an overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown, to produce the injury, there is no liability, although there is some negligence. * * * If the injury was caused by some extraordinary or unusual natural force or condition that could not have been foreseen, or that would have caused the injury if there had been no negligence, the negligence is not the proximate cause of the injury." 38 Am.Jur., Neg. 65.
"In the case of Chicago and Erie Railway Company vs. Schaff Bros. Company [74 Ind.App. 227], 117 N.E. 869, an Act of God was defined as follows:
"`An Act of God is the manifestation of a superhuman power which breaks the chain of causation in the realm of human activity.'
"Again in the case of Spencer vs. Daggett, 2 Vt. 92, the Court said:
"`A loss occasioned by a sudden gust of wind, such as rarely happens, is caused by the Act of God.'
"Also, in the case of Carlson vs. A. & P. Corrugated Box Corporation [364 Pa. 216], 72 A. (2d) 290, the Court defined an Act of God as follows:
"`An Act of God is an unusual, extraordinary, sudden and unexpected manifestation of the forces of nature which cannot be prevented by human care, skill or foresight.'
"Again in the case of Snyder vs. Farmers Irrigation District [157 Neb. 771], 61 N.W. (2d) 557, the Court said:
"`The pharse "Act of God" does not necessarily mean an operation of natural forces so violent and unexpected that no human foresight or skill could possibly have prevented its effects, but it is enough that the accident should be such as human foresight could not be reasonably expected to anticipate, and whether it comes within such description is a question of fact.'
"We realize that the above quoted cases are taken from jurisdiction other than Louisiana, but we feel that their definition of `Act of God' is so good that these cases are worth quoting. After all, an Act of God is the same whether it be in Louisiana or elsewhere, and the definition accorded it in one locality would certainly be applicable to any other locality. We feel, that after taking these definitions into consideration, that certainly the evidence adduced on the trial of this case proved overwhelmingly that this accident was the result of an Act of God.
"The Courts of the State of Louisiana have followed the definitions of Act of God hereinabove quoted, as is shown by the language of the Court in the case of Southern Air Transport vs. Gulf Airways [215 La. 366], 40 So. (2d) 787, wherein the following definition is given:
"`An Act of God in the legal sensethat which will excuse the discharge of a duty and relieve a defendant from liability for injuryis a providential occurrence or extraordinary manifestation of the forces *515 of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care, or by the use of those means which the situation renders reasonable to employ * * * Fortuitous event is that which happens by a cause which we cannot resist.'"
"The Trial Court in its charges to the jury defined an Act of God as follows:
"`An Act of God in a legal sensethat which will excuse the discharge of a duty and relieve a defendant from liability for injuryis a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ.'[68]
"Wherein Justice Hamiter held that winds of sixty to seventy miles per hour causing parked airplane to roll along concrete apron and collide with another parked airplane did not constitute an `Act of God' so as to relieve owner of first plan from liability for damage to other plane, where such winds would not have moved plane had its parking brakes been locked and functioning. The Court held:
"`Concurring with the strong winds to cause the accident, it logically follows, was the failure of duty on the part of the defendant to properly secure its plane.'

"Natural Forces or Conditions: Act of God"
"One who is himself without fault has, in justice and common fairness, a right to recover from one who has caused him loss by a negligent act, although an ordinary natural occurrence entered into the chain of events which culminated in the loss. If negligence is of a character which according to the usual experience of mankind is likely to afford an opportunity for the intervention of a natural cause, an injury caused by the negligence in conjunction with the natural cause is the proximate result of the negligence, although the particular details of the damage cannot be anticipated accurately. The ordinary conditions of forces of nature, such as ordinary wind, cold, heat and the like, that are usual at the time and place and under the circumstances, and that reasonably should have been expected or foreseen as probable to occur, are not, in general, independent, efficient causes where they affect or operate on a negligent act or omission in causing a result. Those who are negligent are held in law to know the usual effect of ordinary natural conditions and forces on their negligence or on its proximate results, and to be liable in damages for the natural and probable results of the negligence.[69]

"Act of God
"An Act of God is an unusual, extraordinary, sudden, and unexpected, manifestation of the forces of nature which man cannot resist. The fact that no human agency can resist an Act of God renders misfortune occasioned solely thereby a loss by inevitable accident which must be borne by the one upon whom it falls. On the other hand, when an Act of God combines or concurs with the negligence of the defendant to produce an injury, the defendant is liable if the injury would not have resulted but for his own negligent conduct of omission.[70]
"`No one is liable for an injury proximately caused by an Act of God, which is an injury due directly and exclusively to natural causes, without human intervention, which could not have been prevented by the exercise of reasonable care and foresight. The application of this rule may preclude any recovery for injuries caused by extreme weather conditions, * * * or extraordinary and unprecedented * * * winds, * * *.
"`An act which may be prevented by the exercise of ordinary care is not an act of God.'[71]"
In addition to the quote from 38 American Jurisprudence, Section 75, page 734 *516 taken from the plaintiffs' brief, we also find the following statement of the law in the same citation as follows:
"* * * The fact that the wind changes direction during the course of a fire negligently started by a person does not relieve him of responsibility for the destruction of the property to which the flames are carried after such change in the wind. On the other hand, if the natural cause is disconnected from the negligence and is self-operative in producing an injury, the negligence is not actionable, since the element of proximate cause is absent. If the injury was caused by some extraordinary or unusual natural force or condition that could not have been foreseen, or that would have caused the injury if there had been no negligence, the negligence is not the proximate cause of the injury. If the natural condition or force that affects the negligent act or omission is unusual or extraordinary, the negligent party will not, in general, be held to have known of or contemplated it, unless the circumstances of the particular negligent act or omission are such that the negligent party should have known of or contemplated the probable appearance and effect of such unusual or extraordinary natural condition or force. Thus the opening of a garage door by a wind which is of such violence as to be the equivalent of the vis major is a responsible intervening cause which destroys the causal connection between a defective latch upon the door and injuries to a boy at play occasioned by such latch as the door opened, and negatives liability asserted on the theory of negligence in the retention of the defective latch upon the door. * * *."
A review of the facts is necessary in order that we may determine whether the storm in question should be considered as an act of God within the legal definition and jurisprudence, supra, on the subject, and also to determine whether there was any concurring negligence, if it be considered an act of God, on the part of the defendants but for which the injury to the plaintiffs would not have resulted.
The evidence shows that the tree which fell on the trailer was two to three feet in diameter at the base and after it blew down was found to be defective in that the heart in the center had rotted so as to leave a hollow estimated at four to six inches in diameter beginning at the ground and going a distance up in the tree of approximately 12 feet. It is also established by a preponderance of the evidence that the tree to all outward appearances was sound and healthy. Even plaintiffs' experts agreed with this finding, however, two of them testified that an examination by a tree surgeon or expert would have revealed the defective condition in the center of the tree. One of them testified that certain fungus growth around the tree, or on it, denoted an unhealthy condition to the trained eye, and the other expert of the plaintiffs found a hole between the root at the base of the tree approximately two inches in diameter into which he could run a stick and discovered the hollow condition in the base of the tree. However, one witness who kept the grass clean around this tree testified he had never seen this hole although he had worked around the tree cleaning up on occasions. The experts also stated that in order to determine the extent of the defect it would have been necessary to have opened the tree or drilled holes in it, that by merely looking, the extent of the defective condition could not have been estimated. Even plaintiffs' own two tree experts frankly testified that the tree to all appearances to the ordinary person would be healthy, sound and normal. Plaintiffs' expert, Mr. Borskey, testified that had he inspected the tree before it fell he would have condemned it and recommended that it be taken down and it was his opinion that it would not have fallen on the trailer during the storm had it been a healthy tree throughout. This witness described the storm as a "small wind." The record also contains testimony as to the weather by the witness who was some distance from the trailer park (at Florida and 22nd) who emphasized the rain "about as hard as I *517 ever did see it but it never last but two minutes * * *", but evidently was unimpressed by the wind at that location. Thomas Vining, witness for the plaintiff who was at the trailer court in his trailer approximately 120 feet distance from the plaintiffs' trailer, described the wind as "blowing pretty hard and it was raining very hard * * *", and described his failure to hear the tree crash on the trailer because of the rain on top of his house trailer.
On the other hand, the defendants offered the testimony of a number of witnesses with regard to the tree which fell on the plaintiffs' trailer, its appearance prior and subsequent to the storm, the nature of the storm, and its effect generally in the parish and surrounding area. One of these witnesses was Harry R. Baker, a tree expert, who testified that his business was tree surgery and that the storm of Nov. 18, 1957, had caused a great deal of tree damage in the parish. He had examined the tree in question which, prior to its falling, would have appeared as a healthy tree, however, an inspection by him for the purpose of testifying showed that it had decayed in the center for about 4 to 6 inches with 12 to 14 inches of solid wood, however, in some places it was probably thinner than that. The force which broke this tree off above the ground was a "torque" or twisted force from the wind; also that a steady, straight, sustaining wind of 50 miles an hour would not have blown the tree down; that had the tree been blown down because of its defective condition it would not have been twisted in splinters; he testified as to a 28 inch post oak that was "broken over with a long 14 foot splinter split * * *" as a result of the wind on Nov. 18, 1957, on the property of Mr. Roy E. Brady at 9536 Woodbine; that this tree was broken between 14 and 18 feet above the ground and although there was some decay evidence, that it had 20 to 22 inches of solid wood; that there was another tree in Goodwood Place which was not very far from the Twin Cedars parking lot in which the top was broken out 50 feet above the ground and this tree showed no decay; another tree, a 26 inch water oak broken off 25 feet above the ground. Although it was a solid tree it was also splintered; a 24 inch poplar tree broken off five feet above the ground, splintered but with no decay. There were other trees surrounding these trees which were not damaged which happens in any kind of storm. This witness was also called to Dr. Barrow's farm at Pride, Louisiana, where the storm took the entire roof of a building, consisting of the shingles and the paper. On cross-examination this witness testified that in his opinion the wind which blew the tree down had to be a twisting wind "or have a twisting nature * * * and that I estimated it would take a wind of 45 to 60 miles an hour to do that." This witness testified that in certain storms, healthy trees had blown down while defective trees had stood, and that this was due to the manner and method in which the wind was blowing, that is, the twisting wind coming in gusts was striking the healthy tree with full force and would take it down whereas it would not strike in the same manner the defective tree.
Defendants offered the testimony of James E. White, another tree expert who was called out on Nov. 18, 1957, as a result of the storm, to the Crotwell property on Donmoore Avenue where he found a water oak 24 to 30 inches in diameter had been broken off about 30 feet above the ground and he further found that it was a solid sound tree; he had another job about half a block from the latter tree on Florida Street which was a water oak approximately 24 to 30 inches that had broken off about 20 feet above the ground, and this tree had no evidence of decay. The break was "a long splintered break." He described the wind as being "quite a bit of gusty, whippy wind; that's what I call unpredictable, it blows in any direction, one minute it would hit you from one side and then the next minute the other side, a whipping motion." He further stated that prior to November 18, 1957, he had not *518 seen a storm of that same particular nature except one along in May of 1956 which struck in another section and ran in one path for about four or five hundred feet wide; he also remembered hurricane "Audrey" which had winds of much higher velocity that was prior to this storm. On the morning of November 18, 1957, he stated he was "over Baton Rouge for storm damage and tree calls from Denham Springs to the South end of Baton Rouge * * *" and that he drove by the Twin Cedars Trailer Park the afternoon of that day and saw the tree which had blown down but did not stop to examine it; he also testified to seeing a tree fall down in his presence in Broadmoor.
Mr. and Mrs. J. H. Mann had trailer space at the Twin Cedars Trailer Courts on Nov. 18, 1957 and became so frightened and concerned about the storm that they left their trailer and went into one of the rest rooms. Mrs. Mann testified that they had left the trailer at Port Allen one time prior to this storm but did so because they were told to leave and go to the community center, but that she was not "as afraid as I was in this storm here because it shook my trailer pretty badly * * *," and that she had never seen a storm since that time that would compare to that one. Under cross-examination she testified she became frightened because the wind was pretty strong and when she looked "over in the field there and I saw the rain coming and it looked just like, almost just like milk and that's what scared me because I am very scared of wind, now * * * and of course this one was so severe. * * * I couldn't tell you how high the wind was, but it seemed to me like it must have gone 100 miles an hour, the way it was blowing."
Another witness on behalf of the defendant, Wayne E. Turk, a house trailer service man for G.W.G. Corporation remembered the day of the storm well because he had to go repair a trailer where a limb had blown through the top at the Florida Street Circle. He described the wind as being "pretty severe that morning and it stayed severe for practically, well, practically as far as I remember it was almost two or three hours there from what I remember and what I seen that morning." He had only seen one other storm as severe which was "when the hurricane come through, and he was in Port Allen at that time."
Mrs. Wayne Turk, an employee of the defendants, described the storm as "raining terribly hard and the wind was blowing terribly hard, * * *, but I was looking out the front window and you couldn't see across the street for the rain and wind just blowing terribly." She had never seen wind blow that hard before except in 1947 when a hurricane occurred and they were living in Port Allen, Louisiana.
Joseph Cantu, Jr., a witness on behalf of defendant, stated that on the date of the storm he was living on Lobdell Avenue which was close to the Jefferson Highway in Baton Rouge, La., and when he returned from work to his father's home which was also on Lobdell Avenue, he saw three trees that had fallen and one of them had fallen across a small car that he owned, and mashed it. There was another big tree that fell on the lot that belonged to his father and he described another on the lot that fell across his father's barn and demolished it. The tree which fell on the car was a gum tree approximately two and one-half feet in diameter and it had been broken off or splintered about five feet above the ground and while he did not examine any one of the three trees minutely, he stated "I know that the trees was all green and good, and had been growing there, as well as I know of the past twenty years." He estimated that there were between forty and fifty trees on the two lots owned by his father and only these three were blown down. He stated that the storm which they had around 1947 was worse than the one on Nov. 18, 1957, but he had not seen one as severe as that since that time. Under cross-examination this witness described the tree which fell on "a large barn" belonging to his father as *519 being three to three and a half or four feet in diameter and it demolished the barn. This witness estimated the distance to the Twin Cedars Trailer Court as being around three quarters of a mile.
Also placed on the stand as a witness was William E. Carpenter, a well known meteorologist of Baton Rouge, Louisiana, "who is known as Tex Carpenter and appears on television with weather forecast." He testified that on the morning of the date in question a cold front came through Baton Rouge accompanied by wind and rain; that he was familiar with the reports issued by the United States Weather Bureau at Ryan Airport, Baton Rouge, La., and in connection with his testimony this report was introduced and showed the following:

"10:30 A.M. South-southwest 29 M.PH gusts to 43 MPH
 10:37 A.M. south-southwest 29 " " " 44 "
 10:44 A.M. south-southwest 35 " " " 46 "
 10:58 A.M. south-southwest 35 " " " 53 "
 11:30 A.M. southwest 21 " " " 35 "
 11:58 A.M. west-northwest 17 " " " 29 "

Peak wind observed during the day was 54 MPH at 10:52 AM."
He testified that when a cold front comes through one of its characteristics is a wind shift from southwest to the west-northwest, and in this case an hour later the wind was to the north, which would signify changing and shifting directions of the wind. He further stated that it would not be unusual to have the Ryan Airport station record a wind velocity at a given time of 53 MPH and at the same time have another area of town, such as, "in this instance Twin Cedars, experience a wind of a much higher velocity than that recorded at the same time at Ryan Airport" for the reason that "In any front of passage there can be anything from a slight breeze to a tornado." He testified further that it was nothing unusual for such winds to blow down one tree out of many trees.
Under cross-examination this witness was asked if his testimony did not mean that although he could have an accurate reading of the wind at Ryan Airport, whether the velocity of the wind at Twin Cedars Trailer Park, which was six or seven or eight miles to the southeast, might not be completely different velocity at the same reading, and he answered "It could be calm at Twin Cedars and 100 MPH at the Airport and vice versa."
We are of the opinion that the wind which blew this tree down at the Twin Cedars Trailer Court on Nov. 18, 1957, was blowing in gusts and in a shifting manner so as to apply a twisting force to any object which it struck and that it was of sufficient velocity and violence so that when it struck a tree, whether sound or defective, at the peak of its twisting force, it twisted it off as shown by the evidence in this case in each instance, above the ground. We therefore hold that the cause of the blowing down or twisting off of this tree at Twin Cedars Trailer Park was caused by an act of God within the meaning of the legal definitions, supra.
While we, as stated, are of the opinion that the injury to plaintiffs was proximately caused by an act of God, due directly and exclusively to natural causes without human intervention and could not have been prevented by the exercise of reasonable care and foresight, counsel for plaintiffs strenuously contends that in view of the fact that the defendants had knowledge and had been apprised of the decayed condition of two or more trees in the trailer park, and did nothing to remedy the situation *520 nor retain a tree surgeon nor other expert to examine all of the trees, which, if it had been done, they would have been able to learn that the tree in question was also defective, decayed and dangerous, and the defendants, therefore, were negligent in allowing such a potentially dangerous condition to continue "though it was not apparent or obvious." He then contends that after learning of the defective condition of the trees, reasonable prudence, diligence and care would have demanded that they remove the tree prior to the date of the storm. Counsel relies upon Gibbs v. Tourres, La.App., 50 So.2d 652, and Hart v. Town of Lake Providence, 5 La. App. 294, to support his contention that although the defective condition of the tree which fell was not apparent or obvious, that having been put on notice because of the decayed condition of two other trees on the Trailer Park, they were negligent in not having all the trees, including the one that fell, examined by an expert, and, therefore, were liable.
In the Gibbs case the limb of a tree on the property of Tourres extended over the driveway of Gibbs, and while his Ford truck was parked in the driveway the limb fell causing damage for which Gibbs sued Tourres. The defense was two fold, that Gibbs had been authorized by Tourres to remove the over-hanging limb, and, second, that the falling of the limb which caused the damage in question was occasioned by the vis major, in the form of a wind of tornadic cyclonic proportions, which struck the city of Natchitoches at the time and on the date in question and allegedly caused the falling of the limb or part of the tree which damaged Gibbs truck.
As to the first defense the court did not find same tenable, however, as a fact it found that Gibbs had complained to Tourres about the limbs overhanging his drive and requested their removal, and had taken the trouble to send a tree cutter to talk to Tourres about removing the trees on her property but that no action was taken by Tourres. The tree man had previously approached Tourres on another occasion and offered to remove these trees for a nominal cost because he thought he could use them for fence posts, however, at the time he contacted Tourres at the request of Gibbs, the plaintiff, he discovered that the trees were useless for posts by reason of their decayed condition and accordingly had made a substantial increase in his proposed charge for their removal.
On the second defense the court found that the wind was not of such a violent nature or proportion as might justify a classification as a vis major. The court specifically found that the preponderance of the evidence conclusively pointed to the fact that the falling of the limb was due primarily to the decayed and rotted condition of the tree itself. The defendant Tourres then urged that inasmuch as the danger of the falling of the tree or limb was not obvious to a casual observer, in other words, was neither probable nor foreseeable, that consequently, defendants were not guilty of negligence. The court held:
"While we thoroughly appreciate the application of the general rule that one is not responsible for unforeseen and improbable results, we do not think the rule is applicable under the facts here involved. Certainly there was some element of danger involved which was brought to the attention of defendants by the owner of the adjacent property. This is substantiated by the testimony of the witness, Waters, the tree cutter. Being apprised of this condition, even though it was not apparent nor obvious, certainly defendants were guilty of negligence in allowing the potentially dangerous condition to continue. As was pointed out in Lynch v. Fisher, La.App., 34 So.2d 513, the fact that a particular injurious consequence is improbable or not to be reasonably *521 expected is not an adequate defense." [50 So.2d 654.] (Emphasis added.)
We do not feel that this case is applicable under the facts for clearly the court found that a tree man had informed the defendant of the defective condition of the tree from which the limb actually fell, while in the present case the tree which fell on the plaintiffs' trailer was admittedly to all outward appearances perfectly sound and healthy and no one had any idea it was defective until after it had been twisted off by the force of the wind, and split open so that they could detect the decayed condition of the heart of the tree. Had the tree which fell because of its defective condition on a calm day in another part of the park been the one that fell on the trailer, then it would have been a different story, or had the tree which one of the witnesses described as being defective in his opinion which he formed as a result of having driven a spike or nail into it and which also appeared to be decayed to the naked eye and which had been conveyed to the owners of the trailer park, which fell on the trailer, this too, would have been a different story and a different conclusion.
In the Hart case, the father of the plaintiff was killed on a public street of the town of Lake Providence by a guy-wire pole falling on him and crushing his head while he was traveling along the street in his automobile, and the cause of the falling of the guy-wire pole was the breaking and falling of a dead limb 8 to 10 inches in diameter and 35 to 40 feet long from a tree standing in the street. The defendant contended that the falling of the limb was vis major an Act of God for which it was not responsible. The court recognized the rule that an act is held to be vis major only when it was of such a nature as ordinary foresight and prudence could not anticipate it. It also proceeded to investigate the evidence in order to ascertain the kind of wind that was blowing at the time the wind fell and found that the cause of the dead limb falling was not a vis major as the wind was not even considered as a "storm." The court found as a fact that this dead limb 8 to 10 inches in diameter and 35 to 40 feet long was liable to break and fall at the slightest wind, or even in the absence of any wind from its own weight.
The defendant contended that it was not liable as it had not been actually or constructively notified of this dangerous condition, however, the court expressly held that this dead limb had remained on this tree standing in the public street of the town for more than a year in dangerous proximity to an electric light wire strung on poles along the street and was constructive notice to the governing authorities of the town of its nature and presence.
Factually the Hart case is not applicable to the case at bar. The dead and dangerous limb was allowed to remain for a year and was obvious. In the case at bar there was no obviously dangerous or defective condition of the tree which fell on plaintiffs' trailer. We reiterate that it was obviously perfectly sound and healthy to the human eye.
Counsel also relies upon the case of the City of Hattiesburg v. Hillman, 222 Miss. 443, 76 So.2d 368, in which it is shown that on a windy day in March a limb 8 or 9 inches in diameter, 18 to 20 feet long, weighing about 200 pounds, broke off of an oak tree and fell 12 or 14 feet on a child with such force as to fracture her skull, resulting in death about two hours later. The facts reveal that the tree had been dead for nearly two years and the jury found that the city had actual knowledge of its dangerous condition. On appeal the court said that regardless of that fact it was obvious that the slightest observation and inspection would have disclosed such a condition and that even without actual notice the danger of this dead tree which had existed two years should have been ascertained in a reasonable time and that such lack of knowledge for such a long period could not be excused, and that it was reasonably foreseeable that injury was likely *522 to happen to someone, and that the child's death was the proximate result of the failure of the city to remove a dead and dangerous tree from the street when it knew, by the exercise of reasonable care or ought to have known, the potential danger. It further stated that the unfortunate death could not justly be attributed to an Act of God as the wind which was blowing was the same as usually blows on an ordinary March day, that no other limbs fell in the area on that occasion. The Court correctly held that had the city exercised ordinary care it would have removed this dead tree and the injury and death to this child would have been prevented. This case is factually inapposite. Nor do we believe that the defendants in the case at bar were under a duty because of one or two other defective trees in the trailer park, and there were many according to the testimony, to have each tree bored into or opened up, for the testimony shows this is the only way that the actual extent of the defective condition of the tree which fell on the trailer could have been ascertained.
Counsel also relies upon a recent case of the Supreme Court, viz., Southern Air Transport v. Gulf Air Ways, 215 La. 366, 40 So.2d 787, 791, in which an airplane belonging to the defendant had been parked approximately 200 feet south, facing north, from a plane of the plaintiff, without securing the plane either by tying it down or setting the brakes, and due to a wind of approximately 60 to 65 miles per hour with gusts up to 70 miles per hour, had rolled into the plaintiff's plane damaging it, for which the latter filed suit. The court found, however, that even with wind of that strength that the plane could not have rolled if it had been properly secured as aforesaid. The court found that the defendant had failed in a legal duty which devolved upon them to secure the plan so that injury to others would not occur, and that such failure was the proximate cause of the injury and damage to the plaintiff's plane, for the evidence shows that it would not have occurred had the brakes been set or had it been properly tied. The court then specifically found that "Concurring with the strong winds to cause the accident, it logically follows, was the failure of duty on the part of the defendant to properly secure its plane."
Neither is this case apposite to the one at bar for the injury and damage to the plaintiffs was caused herein by an Act of God in the legal sense, that is, a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence, and care or by the use of those means which the situation renders reasonable to employ. The only way that these defendants could have avoided the effect of this act of God would have been to have had reason to have removed this tree prior to the date of the storm. There was no reason for them to believe different from every other resident of the trailer park who had observed this tree and thought that it was sound and healthy in every respect, and, therefore, no failure to exercise reasonable prudence, diligence or care or the necessity to use means to have the tree removed.
It is not necessary that we consider the other contentions of the plaintiffs' in view of the fact that we have come to the definite conclusion that plaintiffs' injuries were produced by an act of God for which the defendants are not to be held liable, under the law.
We are of the opinion that the verdict of the jury is manifestly erroneous in the above respect and it is therefore ordered that the judgment be reversed and the suit dismissed at plaintiff's costs.
Reversed.
NOTES
[1] In support of this contention the plaintiffs state in their brief: "The defendants herein, landowners, and owners of the Trailer park, had knowledge of and has been apprised of the decayed condition of two or more trees on their Trailer Park; nevertheless did nothing to remedy the situation and did not retain a Tree Surgeon or other expert to examine all of the trees, had they done so, they would have been able to learn that the tree in question which fell on the Rectors' trailer was also defective, decayed and dangerous and the defendants therefore were negligent in allowing such potentially dangerous condition to continue, tho it was not apparent or obvious. This proposition was already ruled upon in two other Louisiana cases.72"

"72. Gibbs v. Tourres, La.App., 50 So.2d 652; Hart v. Town of Lake Providence, 5 La.App. 294.
[68] Southern Air Transport v. Gulf Airways, Inc., 215 La. 366, 40 So.2d 787.
[69] See Vol. 38 American Jurisprudence, Sec. 75, page 734Negligence; The Mariner (C.C.A. 5) 17 F.(2d) 253; Benedict Pineapple Co. v. Atlantic Coast Line R. Co., 55 Fla. 514, 46 So. 732; 20 LRA (NS), 92.
[70] See Vol. 38 American Jurisprudence Sec. 7 on Negligence p. 649.
[71] See Vol. 65 Corpus Juris Secundum, Negligence, Sec. 21(b) Pages 432-433; City of Hattiesburg v. Mrs. Clydie Mae Hillman, Adm's [222 Miss. 443] 76 So.2d 368.