165 So. 703

**HOLLEY et al. v. LOUISIANA RY. & NAV. CO.**

No. 33128.

Jan. 6, 1936.

Rehearing Denied Feb. 3, 1936.

A. L. Burford and Burford & White, all of Shreveport, and White, Holloman & White, of Alexandria, for appellant.

Joe B. Hamiter, of Shreveport, and Henry W. Bethard, Jr., of Coushatta, for appellees.

FOURNET, Justice.

This is a suit to recover the sum of $13,460 for damages resulting from the inundation of plaintiffs' property, allegedly caused by the fault of defendant in constructing a double culvert across Bayou Nicholas to replace a 238-foot railroad trestle bridge, thereby obstructing the flow of the bayou.

The plaintiffs are the owners of Gilmore Plantation and Briar's Bend lying west of the right of way of the Louisiana & Arkansas Railway Company in Red River parish. It is their contention that their land was provided by nature with adequate, proper, and sufficient drainage through the means of Bayou Nicholas; that, until the defendant company in 1925 replaced its former trestle bridge with the double culvert in question, plaintiffs' property was not subject to overflow from rainfall; that, because of the inadequate capacity of the culvert, the water could not naturally and freely continue on its way to the Red river, and a great volume of water was impounded against the embankment of defendant's right of way, which forced the flow of the water to reverse itself and caused the water to seek other than its natural outlet into Red river, and thereby inundated plaintiffs' land; and that, as a result of said inundation, plaintiffs suffered

damages as follows: (1) To cotton, $5,960; (2) to soil erosion and caving, $7,500.

The defense is that at the time of the inundation of the land there was a "phenomenal" rainfall on July 23, 24, and 25, 1933, and that the unusual rainfall was the sole cause of the flood and not the inadequacy of the culvert; that the capacity of the culvert was commensurate to the capacity of the channel below the culvert to dispose of the water into Red river; and that plaintiffs' damages are exaggerated.

On these issues the case went to trial, and judgment was rendered in favor of the plaintiffs for the sum of $11,040, being $6,040 for damage to cotton and $5,000 for caving banks and soil erosion; the trial judge assigning no written reasons for granting the judgment.

The defendant has appealed, and the plaintiffs have answered the appeal, asking that the judgment be increased to $13,460.

It is an undisputed fact that the rainfall of July 23, 24 and 25, 1933, was the heaviest recorded in the history of the United States Weather Bureau. The greatest rainfall for any one month ever recorded by the government for that vicinity prior to July, 1933, was 16.46 inches during September, 1913. On July 23d the rainfall was 5.11 inches; on July 24th it was 12.05 inches; and on July 25th it was 1.92 inches, a total rainfall for those three days of 19.08 inches. During the period from 7 p. m. to 1 a. m., o'clock on the 24th of July, it rained at the rate of practically one inch an hour, or 6 inches in six hours. As the result of the intensity

of the rain during those six hours, in addition to the amount of water due to the rainfall of the day before and after, which comes from the hills for which Tumbla Bayou is a drainage basin, the water discharged into Bayou Nicholas at the rate of 4,000 to 5,000 cubic feet each second, while the culvert in question was only capable of discharging between 800 to 1,000 cubic feet each second, thus leaving 3,000 to 4,000 cubic feet each second that found an outlet over the plaintiffs' property into Red river.

Therefore we must determine whether or not the 19.08 inches of rainfall on July 23, 24, and 25, 1933, would have caused the inundation and overflow of plaintiffs' property if the defendant had not replaced the railroad trestle bridge with the culvert in question.

In support of their contention, plaintiffs depend upon the report and testimony of their expert witness, Mr. A. A. Lyons, a civil engineer formerly in the employ of the city of Shreveport as drainage engineer; also that of Mr. T. L. Amiss, a licensed practical engineer in the employ of the sewerage and water department of the city of Shreveport, who was called as a rebuttal witness only; and also the testimony of numerous lay witnesses.

The sum and substance of Mr. Lyons' testimony on this question is stated by him in his report to plaintiffs and filed in evidence, which is as follows:

"The question will be asked, "What would have happened on July 23–24–25 had the original 230 ft. bridge been in?" Naturally the same amount of water would

have come down Bayou Nichols, but it would never have had an opportunity to pond, and as the channel, unobstructed, would have allowed a free passage and *each intermittent rainfall would have dissipated itself before the next one fell,* thereby allowing the channel of Bayou Nichols to care for the fall of July 23–24–25 without attaining a height to put the same out of its banks or no higher than was present on the down stream side of the culvert at the time of overflow. Had this condition prevailed, the water could never have damaged the Holley lands as this elevation would have never put the Bayou out of its banks, and the farm lands would have been from 1½ ft. to 4½ ft. above water in Bayou Nichols." (Italics ours.)

On the subject of whether or not plaintiffs' property was subject to overflow from rainfall prior to the installation of the culvert and as to the damage suffered by plaintiffs as the result of the July, 1933, overflow, several lay witnesses testified in behalf of plaintiffs. Mr. R. A. Giddens, postmaster, banker, and ginner of Coushatta, stated that from the year 1886 down to the time the culvert was placed in the bayou in 1925 there had not been any internal overflow from rainfall on plaintiffs' property; that the overflows of 1890, 1892, 1908, and 1927 were caused by the rising of Red river, whose waters backed up into Willow Lake through Bayou Nicholas and over plaintiffs' property, but under cross-examination he admitted that to his knowledge there had never been any overflow of plaintiffs' property whatsoever from rainfall until the one of July,

1933. Grant Hubbard, an old colored man who had resided in the vicinity of plaintiffs' property about 20 years, gave testimony to the same effect. Roger Grant testified that he was 63 years of age and had lived all his life in that vicinity, and, when interrogated as to whether or not there had ever been an overflow from rainfall when the old trestle bridge was where the culvert now is, answered, "no, Sir; *never before last year*" (1933).

Other witnesses testified on the same subject with considerable variations as to dates and extent of the overflow between the erection of the culvert in question and the 1933 overflow. For example, Frank Holley, brother of Z. P. Holley, who is one of the plaintiffs and uncle of the other plaintiffs, and who lives about one-half mile from plaintiffs' property, did not know of any overflow during that period of time, but did say that "it may have practically overflowed at other times." Teer Woods, who lives on the place, stated that it was a common occurrence after every rain for Bayou Nicholas to get out of its banks and overflow plaintiffs' property. Z. J. Holley, one of the plaintiffs, stated that after each rain the bayou flooded from 150 feet to 300 feet on each side.

On the other hand, defendant produced evidence of several lay witnesses, including Mr. Briant Smith, 79 years of age, and the second registered surveyor in Red River parish, who testified that in 1892 he examined the Briar Bend and Gilmore Plantation now owned by plaintiffs, with the view of purchasing the property, but did not do so because he found the drainage

conditions bad and had no chance of improving them. He testified further that in 1902 he saw the water run up Bayou Nicholas from the mouth of Bayou Tumbla due to a heavy rain and the water from Bayou Tumbla. Eddie Wood said that from 1914 to 1925 he had lived on the place with his father, who had contracted to buy it, and in 1923 rain caused 45 to 50 acres to be overflowed. E. C. Wood, a brother of the foregoing named witnesses, remembered that in 1919 the water from rainfall backed out into Willow Lake and overflowed the low places near the bayou. D. P. Woods and his son, P. K. Woods, lived near the place from 1922 to 1925 and cultivated some of the land, and saw water from rainfall get on the property and run into Willow Lake. Sam Wilder, a graduate of the Louisiana State University, who formerly lived near the property, remembered that a portion of plaintiffs' property had been overflowed from rainfall several times, and particularly in September, 1913, when the water ran over the property into Cut Off Lake.

Thus it may be seen that we have a hopeless conflict of testimony between plaintiffs' own lay witnesses as well as between those of defendant's and plaintiffs' as to whether or not the property had ever been flooded by rainfall prior to 1925 and from then up to 1933.

The defendant produced several expert witnesses, including: (1) E. L. Salisbury, defendant's chief engineer, who has had extensive engineering experience in drainage engineering, having been connected with the engineering departments of various railroads from 1909 and has been employed by the defendant since 1920; (2) C. N. Kast, defendant's assistant engineer, who graduated from Renslaer Polytechnic Institute of New York in 1900 and has had wide experience in various fields of engineering since that time; (3) G. E. Dutton, a licensed surveyor, who has had a great deal of experience in the drainage of farms in the Red river bottoms; and (4) Capt. John Paul Dean, of the United States Corps of Engineering, who is a graduate of the United States Military Academy and the Massachusetts Institute of Technology in engineering. Capt. Dean taught hydraulic mechanics at West Point; was engaged in the construction of hydraulic electric plants at Muscle Shoals; and has had vast experience in flood control work, particularly on the Mississippi river; and is presently in charge of executing the flood control plan on the Mississippi river, with headquarters at New Orleans. He prepared the engineering evidence for the government in the Bonnet Carre spillway litigation which involved flowage rights in the spillway just above New Orleans.

Capt. Dean was asked by the court:

"With the conditions that were existing before this culvert was built, as you understand them, would all of the water have gone through under that railroad track?"

To which he answered:

*"Not at this point it would have distributed exactly the same, or so nearly exactly the same, that you could not measure the difference.* If conditions existing in 1925 had existed in 1933 Mr. Holley's plan-

tation would never have known the difference; it would have overflowed just exactly the same as it did in 1933. Would not have been able to have measured the difference." (Italics ours.)

The reason therefor is explained by Capt. Dean as follows:

"Q. With the water coming down Tumbler Creek from this drainage area that has been described, what was bound to be the effect of the condition, as shown by defendant –3, on the large plat on this table?

"A. *The water coming down Tumbler Creek in the quantity or at the rate at which it did in the July flood of 1933, that quantity being greatly in excess of the capacity of the outlets down stream from the concrete box, the water sought the next best outlet. In other words, its low water outlet being filled to capacity, it then took the high water stage outlets in succession as it rose.*" (Italics ours.)

The reasons assigned by Capt. Dean for the water imponding at the upper side of the culvert and seeking another outlet over the plaintiffs' property are corroborated by the testimony of plaintiffs' expert witness, Mr. Amiss, who testified, under cross-examination, as follows:

"Q. Suppose the water reached an elevation of say 2 feet higher than the ceiling of the culvert on the lower end, what would that indicate as to the water below the culvert, as to what was happening?

"A. I don't know that it would indicate a great deal below, *but it would indicate the culvert was spilling as much water as the channel would take*" (below).

"Q. *It would indicate that the culvert would be putting through more water than was getting away below, would it not?*

"A. *If that was the case it would be building up if you had sufficient head behind it.*" (Italics ours.)

Messrs. Kast, Salisbury, and Dutton corroborated Capt. Dean's statement, testifying to the same effect.

Bayou Nicholas below the culvert in question, according to all the testimony of defendant's expert witnesses, as clearly evidenced by photographic exhibits filed in the record, was obstructed and filled with trash.

Messrs. Dutton and Salisbury testified that in order for Bayou Nicholas to have carried off the water from Bayou Tumbla, under the conditions which existed in Bayou Nicholas below the culvert in July, 1933, without flooding plaintiffs' property, the water level below the culvert would have had to be kept at an elevation of not more than approximately 120 feet, and the channel would have had to be 1,250 feet in width by a depth of 4 feet; and, if the channel had been clear, the width would have had to be 400 feet with a depth of 4 feet, neither of which conditions existed.

■ The Supreme Court of the United States, through Chief Justice Taft, has laid down a rule in deciding issues of fact upon which engineering experts differ in the case of North Dakota v. Minnesota, 263. U. S. 365, 44 S.Ct. 138, 143, 68 L.Ed. 342, which we think is applicable to the case at bar. In that case the facts were that North

Dakota sued Minnesota to enjoin the artificial hastening of drainage into an interstate river which was alleged to have caused the overflow of North Dakota lands, and the state also asked for damages to the Dakota farmers alleged to have been caused by the overflow. The defense was that the overflow was caused by the unusual rainfall in the successive years 1914, 1915, and 1916. The court found for the defendant, state of Minnesota, and used the following language:

"It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly, and when their conclusions rest on estimates upon the correctness of which the court, without technical knowledge, cannot undertake to pass. *In such cases, the court looks about for outstanding facts from which the lay mind can safely draw inferences as to the probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions.* The experts called by Minnesota in this case seemed to us to use more specific and accurately ascertained data for their estimates than those for North Dakota, and this circumstance, as well as the more satisfactory reasons given, lead us to think that their conclusions are more to be depended on." (Italics ours.)

■ Both plaintiffs' and defendant's expert witnesses made large maps of the property in question, but the elevations thereon differ. On Defendant's Exhibit No. 3, where the single culvert is located,

and on Plaintiffs' Exhibit A at the same place, there was a difference of .2 of a foot in the elevation. Plaintiffs' Exhibit A shows an elevation on the bottom of the culvert at the upper end of 115 feet. Defendant's elevation at this point was 116.2, a difference of 1.2 feet; thus showing an error of 1 foot in one or the other plat in this comparatively short distance. Lyons, who prepared plaintiffs' map, testified that the double culvert had a slope of one foot. Defendant took the levels at both ends of the culvert, which was 83 feet long, and found the slope to be .6 of a foot, thus showing in this short distance a discrepancy of .4 of a foot.

The record shows that the defendant rechecked its levels several times. G. E. Dutton, surveyor, checked the levels as shown on Defendant's Exhibit No. 3 and found them to be correct. Capt. Dean of the United States Engineers Corps checked the levels at the double culvert as reflected in Defendant's Exhibit No. 3 and found them to be correct. It further appears that, after the case had been on trial three days, the court recessed for a week, and, though the question of the correctness of elevations on the maps had developed on the first hearing, plaintiffs made no effort to have their levels rechecked as defendant did.

Another important difference between the experts for the plaintiffs and defendant is with reference to the high-water marks. They are in substantial accord as to the height of the water above the ceiling of the double culvert in question at the lower end. All of them found the

water to be more than 3 feet above the ceiling of the culvert. But, when it came to determining the high-water elevation on the upper side of the culvert, serious discrepancies in their findings are revealed. Mr. Lyons' testimony on the elevation of the water at that point showed a difference of 4.6 feet between the elevation of the water on the upper and lower side of the culvert, while the testimony of defendant's several witnesses showed the difference to be 1.7 feet. On this point Mr. Lyons testified that he established a high-water mark from drift he found lodged on the right of way and against the cotton stalks; that he could not find evidence of the marks on the foliage and trunks of trees because a shower had washed them away. In other words, he established his high-water mark from the marks left by deposits or drifts left by the high water. Defendant's witnesses established their high-water marks on July 28, 1933, when Mr. Salisbury, chief engineer, who, after Mr. Holley complained of the overflow, sent Mr. T. H. Irwin, roadmaster, and Mr. W. D. McConathy, section foreman, to the double culvert to establish the high-water marks at each end of the culvert. Mr. Irwin's testimony shows that the water marks were fresh and plainly visible on the trunks of the trees, shrubbery, and telephone poles on that day, and, from that evidence he established the high-water mark on the upper side by driving a nail in the telephone pole, and on the lower side by driving a stake by the culvert and then driving a nail in the stake. Mr. McConathy testified to the same effect. Messrs. Kast and Goodwill, when they started their survey a short time later, found these marks and many additional high-water marks on the trees and the shrubbery that checked with the elevations of the marks set by Mr. Irwin at the double culvert. Mr. Dutton rechecked the survey made by Mr. Kast, and found that the high-water marks referred to checked accurately and were plainly visible on the telephone poles, tree trunks, rail fences, and bridge caps. Capt. Dean went over the property the day before the trial and found evidence of the high-water marks referred to, checked their levels, and found that they agreed with the levels found by Mr. Kast.

As to the most reliable evidence to establish high-water marks, we have the statement of Capt. Dean as follows:

"High water marks should be taken on something that you are sure has not moved since the mark was made; therefore, it should be on a fixed object."

Thus it may be seen that the defendant's expert witnesses not only greatly outnumbered the lone expert witness of the plaintiffs, but its expert witnesses used more specific and accurately ascertained data for their estimates, as well as more satisfactory reasons for their conclusions.

From a careful review of all the evidence and the plats and exhibits filed in the record, we find that Bayou Nicholas is substantially an alluvial stream. In dry weather it does not flow, and, except for holes has no water in it. Where it passes through the plaintiffs' property at one time was the bed of Red river, but, after

it leaves the property, it again becomes a bayou with well-defined banks. Above and below plaintiffs' place, it has an entirely different character—above, the bed is wide, reaching a width of several hundred feet, while below the banks are low with a height of 1 to 2 feet. The fall of the bed of the bayou from the upper end of plaintiffs' property for a distance of 9,000 feet is only one foot, and, when the water reaches an elevation of 122 feet above sea level, it pounds and becomes a two-mouth outlet for Bayou Tumbla, a hill stream with a drainage basin of 6,000 acres, which empties into Bayou Nicholas about 1,000 feet above the culvert in question, one discharging through plaintiffs' property into Red river and the other through the bayou below, and at that elevation plaintiffs' property *commences* to flood, because it has an elevation from 122 to 134 feet above sea level.

We find further that the culvert in question was discharging more water than the lower part of Bayou Nicholas could carry, and, while it is true that the culvert could only discharge between 800 and 1,000 cubic feet of water each second at the peak of the flood, that was more than the channel below the culvert could carry off.

It is our conclusion that the rainfall of 19.08 inches for the three days of the month of July, 1933 (by far exceeding the greatest rainfall on record for any whole month during the period for which records have been kept, the heaviest for any one month prior to July, 1933, being 16.46 inches during the month of September, 1913), was not only an unprecedented rainfall, but a phenomenal one, and was the sole cause of the damages sustained by plaintiffs in this case.

The jurisprudence of this state is well settled that one cannot recover damages caused by uncontrollable events. New Orleans & N. E. R. Co. v. McEwen & Murray, 49 La.Ann. 1184, 22 So. 675, 38 L.R.A. 134; Richard v. Baldwin Lbr. Co., Ltd., 142 La. 829, 77 So. 645.

For the reasons assigned, the judgment of the district court is annulled and set aside, and plaintiffs' suit dismissed at their costs.