470 So.2d 149 (1985)
Sharon GABLER, Wife of/and Edward H. Gabler, Jr., Veronica Boudreaux, Wife of/and Lionel Boudreaux, Jaroslav Vydra, Nelson Badeaux, Ernest Markey, Jr., Donna McCloskey, Wife of/and Thomas P. McCloskey, Linda Guidry, Wife of/and Robert J. Guidry, Jr., Irene Cantrelle, Wife of/and Eugene J. Cantrelle, III, Janice Arnold, Wife of/and Hardy A. Arnold, Sr., Lydia Pastrana, Wife of/and Eliseo Pastrana, Carol Clark, Wife of/and Roberto Clark, Rita Tucker, Wife of/and Lloyd Tucker, Jr., Vera Coleman, Wife of/and William Coleman, Mildred Cole, Wife of/and Oscar Cole, Sharon Lafauci, Wife of/and August Lafauci, Jr., Juanita Crystal, Wife of/and Victor Crystal, Marie Gardiner, Norma Snelson, Wife of/and James Snelson, Leticia Legaspi, Wife of/and Alex Legaspi, Margaurite Demolle, Wife of/and Normal Demolle, Leticia Scott, Wife of/and Dario Scott, Joyce Jones, Wife of/and Robert Jones, Emma Lee Buchert, Wife of/and Ernest Buchert, Jr. and Annette Breaud, Wife of/and Kevin Breaud
v.
REGENT DEVELOPMENT CORPORATION, XYZ Insurance Company and the Parish of Jefferson.
No. 84-CA-523.
Court of Appeal of Louisiana, Fifth Circuit.
April 15, 1985.
Rehearing Denied June 17, 1985.
*150 Al J. Mendoza, Mendoza & Hardin, Marrero, for plaintiffs-appellees Sharon Gabler et al.
Gerard M. Dillon, Dillon & Cambre, New Orleans, for defendants-appellants Parish of Jefferson and Fireman's Fund Ins. Co.
John J. Weigel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Travelers Ins. Co.
Rene A. Pastorek, Gretna, for defendant-appellant Regent Development Corp.
Kevin O'Bryon, Hammett, Leake & Hammett, New Orleans, for defendant-appellee, Parish of Jefferson and Jefferson Parish Council.
Before BOUTALL, C.J., and CURRAULT and GRISBAUM, JJ.
CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Division "F", for the Parish of Jefferson, wherein Honorable Floyd W. Newlin rendered judgment in favor of plaintiffs and against defendants on the issue of liability.
This tort action was filed by the owners of twenty-six neighboring residences located along Coubra, Caddy and Sauvage Streets in Bayou Estates Subdivision Extension, Marrero, Parish of Jefferson, State of Louisiana. In the original and five supplemental and amended petitions, plaintiffs complain of the flooding of their residences following heavy rains on May 3, 1978 and April 24 and 25, 1982. Made defendants are the developer of the subdivision extension, Regent Development Corporation (Regent), together with its liability insurer, Travelers Insurance Company (Travelers), and the Parish of Jefferson (Parish) and its liability insurer, Fireman's Fund Insurance Company[1] (Fireman's Fund).
Plaintiffs alleged that Regent, in developing the subdivision extension, constructed streets and houses at certain elevations despite knowledge that the elevations of those streets and houses were inadequate *151 to prevent severe flooding. The Parish was alleged to be negligent in approving the subdivision extension for construction and in negligently maintaining the drainage system. Defendants relied upon the "act of God" defense.
By stipulation, the action was bifurcated as to liability and damages. A most lengthy and confusing trial began on September 12, 1983. Judgment in favor of plaintiffs on the issue of liability, and against all defendants, was rendered on October 4, 1983. All defendants have appealed asserting the following errors:
that (1) the trial court erred in not finding that the sole cause of the plaintiffs' damages was the result of an uncontrollable natural occurrence, in light of its factual findings that adequate elevations and drainage facilities would not have prevented "some" street and home flooding in such an extraordinary situation; that
(2) it was an error to impose liability on Regent Development Corporation and the Parish of Jefferson solely because the plaintiffs had no other legal recourse available to them under the circumstances of these extremely hard rainstorms and accompanying floods; and that
(3) the trial court erred in failing to deny recovery to those plaintiffs who had flood insurance coverage, were compensated by the federal government for their property damage and had assigned to it their rights of recovery.
The phrase "act of God", borrowed from the common law[2], means inevitable accident or casualty. In A. Brousseau & Co. v. Ship Hudson, Captain and Owners, 11 La.Ann. 427 (1856), the court defined inevitable accident, at page 428, as:
"... any accident produced by any physical cause, which is irresistable; such as a loss by lightning or storms, by the perils of the seas, by an inundation, or earthquake, or by sudden death or illness. By irresistible force is meant, such an interposition of human agency, as is, from its nature and power, absolutely uncontrollable." (Citations omitted)
More recently, the court in Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787, 791 (1949), defined an "act of God", sufficient to excuse the discharge of a duty and relieve a defendant from liability, as:
"... a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ."
Then in Rector v. Hartford Acc. & Indem. Co. of Hartford, Conn., 120 So.2d 511, 515 (La.App. 1st Cir.1960), "act of God" was defined as follows:
"An Act of God is an unusual, extraordinary, sudden, and unexpected, manifestation of the forces of nature which man cannot resist. The fact that no human agency can resist an Act of God renders misfortune occasioned solely thereby a loss by inevitable accident which must be borne by the one upon whom it falls ...
"`No one is liable for an injury proximately caused by an Act of God, which is an injury due directly and exclusively to natural causes, without human intervention, which could not have been prevented by the exercise of reasonable care and foresight. The application of this rule may preclude any recovery for injuries caused by extreme weather conditions....
"`An act which may be prevented by the exercise of ordinary care is not an act of God.'"
In the matter sub judice we are faced with damages caused by extreme weather *152 conditions. Excessive rains, floods and inundations have long been considered acts of God. Davis v. Tillman, 370 So.2d 1323 (La.App. 2d Cir.1979); Brantley v. Tremont & Gulf Railway Co., 75 So.2d 236 (La.1954); Holley v. Louisiana Ry. & Nov. Co., 184 La. 175, 165 So. 703 (1936); A.P. Perrin v. Texas & Pacific Ry. Co., 14 Orls.App. 376 (Ops.1885); A. Brousseau & Co., supra.
In Holley, supra, a total of 19.08 inches of rain fell during a three day period: July 23 (5.11 inches); July 24, (12.05 inches); and July 25 (1.92 inches), 1933. The heaviest of these rains occurred during a period from 7 p.m. to 1 a.m. on the 24th of July, when it rained at the rate of almost one inch an hour, or six inches in six hours. The rains which fell on Jefferson on May 3, 1978 and April 24 and 25, 1982 were considerably heavier.
Several witnesses with various degrees of expertise confirmed the intensity of the rainfall on the dates in question. The rain gauge at the Harvey Pumping Station, located only 2½ miles from Bayou Estates Subdivision Extension, indicated that approximately 13.5 inches of rain fell during the 24 hour period of May 3, 1978. Further expert testimony clearly showed that the Audubon Park Station, the closest station to Bayou Estates capable of recording hourly rainfall, indicated that between the hours of 7 a.m. and 10 a.m. a total of 11.95 inches fell on New Orleans.
The rains of April 24 and 25, 1982 were equally torrential. The rain gauge at the Ames Pumping Station, which would most accurately reflect these rains for Bayou Estates, recorded 13.08 inches of rain. The record clearly shows that the greatest intensity of rain during this 48 hour period occurred between 6 p.m. on the evening of the 24th to 4 a.m. on the morning of the 25th. During this ten hour period, 12.92 inches fell at the Ames station.
Beyond any doubt these rains, May 3, 1978 and April 24 and 25, 1982, were "acts of God" (force majeure). Both rains far exceeded all expectations of a storm with a return frequency of 100 years (100 year flood). The entire metropolitan New Orleans area was inundated and indeed there were areas of both the east and west banks of Jefferson and Orleans Parishes that experienced flooding for the first time. Both rains were, as one witness testified, "one sheet of water"; and another who said, "... you couldn't see. I mean you could only see so far and that was it. It just was white."
It is not every "act of God" however that will relieve a defendant of liability. When an injury is due directly and exclusively to natural causes, without human intervention, an "act of God" will provide insulation from liability for a defendant. When an "act of God" combines or concurs with the negligence of a defendant to produce an injury, the defendant is liable if the injury would not have resulted but for his own negligent conduct or omission. Rector, supra.
Not every act or omission of negligence on the part of the defendant, when combined with an "act of God", will produce liability. Rector, supra, at pages 513-514 states:
"The concurring negligence which when combined with the Act of God produces the injury must be such as is in itself a real, producing cause of the injury, and not merely fanciful or speculative or microscopic negligence which may not have been in the least degree the cause of the injury. In other words, if the Act of God is of such an overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown, to produce the injury, there is no liability, although there is some negligence. * * * If the injury was caused by some extraordinary or unusual natural force or condition that could not have been foreseen, or that would have caused the injury if there had been no negligence, the negligence is not the proximate cause of the injury."
Further explained, Rector, supra, at page 516:

*153 "On the other hand, if the natural cause is disconnected from the negligence and is self-operative in producing an injury, the negligence is not actionable, since the element of proximate cause is absent. If the injury was caused by some extraordinary or unusual natural force or condition that could not have been foreseen, or that would have caused the injury if there had been no negligence, the negligence is not the proximate cause of the injury. If the natural condition or force that affects the negligent act or omission is unusual or extraordinary, the negligent party will not, in general, be held to have known of or contemplated it, unless the circumstances of the particular negligent act or omission are such that the negligent party should have known of or contemplated the probable appearance and effect of such unusual or extraordinary natural condition or force."
The sole question for this court is whether or not the trial court was manifestly erroneous (clearly wrong) when it concluded:
"The court finds that the negligence of the Parish of Jefferson and Regent Development Corporation was a contributing causative factor, enhanced the damages sustained by plaintiffs and results in legal liability."
In resolving the "clearly wrong" question, we must first determine if either defendant was negligent; and secondly, if so, was that negligence a proximate cause of the plaintiffs' damage.
In 1968, Fromherz Engineering, Inc. submitted to the Parish a "Master Plan for Major Drainage Facilities." The Master Plan was an attempt to define present (1968) deficiencies in the pumping stations, lateral canals, and main canals, and to project the capital improvement program necessary to remove present deficiencies and provide for population growth and expected land development for the next 25 years. The study and resultant Master Plan concerned itself with the west bank of Jefferson Parish only. When this study was conducted, it was found that the present (1968) drainage pumps, based on nameplate ratings, would probably remove a runoff from a storm producing a total rainfall of about 3.0 inches in 24 hours. Statistically, this is a storm with a return frequency of six months. To upgrade the drainage system to a level acceptable for the urban character, the Westbank was expected to have in 1993 (25 years), a design storm producing 5¾ inches of rainfall in 24 hours was selected. According to the U.S. Weather Bureau records for New Orleans, a 24 hour storm producing 5¾ inches of rainfall is statistically equivalent to a return frequency of two years.
The Master Plan included the Ames Drainage Area, wherein Bayou Estates Subdivision Extension is located. This drainage area contains 3,223.85 acres; and, in 1968, had only the Ames Pumping Station. This pumping station was originally constructed in 1921 and was enlarged in 1959 to house two pumping units, diesel engine driven, each with a capacity of 162 cubic feet per second (CFS) at a ten foot total field head. Although the Master Plan concludes the Ames pumping station, with an installed capacity of 324 cubic feet per second (CFS), was deficient for existing (1968) and projected flows, the study does not direct itself to whether or not this station was adequate when originally constructed in 1921 or when upgraded in 1959. Nevertheless, it is quite evident from the Master Plan that due to time and development of the area, the pump capacity provided by this station had become inadequate.
The Master Plan listed future improvements projects in order of priority along with the recommended timetable, in years, for the implementation of those projects. The priority list contains some ten items. Items 1 through 7 concern themselves with various canal and culvert works. Item 8 is the only proposed project concerning itself with increasing pumping capacity. Item 8 recommends the Ames pumping station be relocated and, when reconstructed, a capacity of 1,000 CFS should be installed within 3 to 5 years, and capable of expanding to *154 2,000 CFS within 15 years. The Master Plan projected the cost to construct a new 1,000 CFS station, between 1969 and 1973, at One Million, Three Hundred Seventy-Five Thousand Dollars ($1,375,000). The cost to enlarge that station to 2,000 CFS, between 1979 and 1983, was projected to be One Million, One Hundred Thousand Dollars ($1,100,000).
J.J. Krebs and Sons, Inc., at the request of Bayou Estates, Inc.-William P. Bosworth, Jr., drew separate master street paving and drainage plans for Bayou Estates and Bayou Estates Extension. Joseph J. Krebs, Jr., an expert civil engineer and chief executive officer of J.J. Krebs and Sons, Inc., testified the company had been doing subdivision development of the west bank of Jefferson Parish since 1953. Although not a high area, he characterized the general Bayou Estates area as usable dry land.
Krebs testified that his firm established the street elevations on those plans and was not involved with nor recommended slab heights. In designing his plans, his only concern was setting the streets at an elevation that would be acceptable with the Parish and one that would prevent street flooding. Krebs stated that although the Parish had a map for the east bank establishing street grades, he knew of no such authority for the west bank. In fact, West Bank street elevations were purely judgment calls based on familiarity with the area and were not in conformity with any parish requirement setting minimum street elevations.
Krebs's plans were used in developing Bayou Estates Subdivision. James Hennessey, President of Regent Development Corporation, testified Regent built approximately 450 houses in that subdivision. To continue their construction, Regent, in 1971, bought from Bayou Estates, Inc. the land upon which Bayou Estates Extension was ultimately built. Hennessey stated that he was not aware Krebs had already drawn plans for the extension. Instead, Regent contracted with Rene A. Harris and Associates to draw a master plan for developing the extension. At this point, with the Harris plans, the problems begin.
The Harris plans called for the streets in the extension to be built approximately 18 inches lower than the streets of neighboring Bayou Estates. All streets, of both subdivision, run east-west and are bounded on the east by Caddy Drive and on the west by Sauvage Avenue. The abutting streets in these adjacent subdivisions are Glasco Drive in Bayou Estates and Coubra Drive in Bayou Estates Extension. According to the Krebs plan, the elevations along the center line of Glasco were 22.4 CD[3] for the lowest point and 22.9 CD for the highest. In contrast, the Harris plans have Coubra ranging from a low of 20.9 CD to a height of 21.5 CD.
Rene Harris testified he was aware the extension streets were 18 inches lower than Bayou Estates, but insisted his plans were drawn within Parish guidelines. He further testified that he knew he could lower those streets because he was told that runoff was to drain to that area and that there either was or would be improvements in Parish drainage. Although he cannot recall who from the Parish had given this assurance of better drainage, he nevertheless knew of improvements through general conversations. It is understandable Harris could not recall such specifics as he had dealings with numerous Parish representatives and the extension was developed 12½ years prior to trial. Hennessey stated he never told Harris to lower the streets nor had he ever requested approval of Harris's plans from anyone employed by the Parish.
Once a developer has plans for developing a subdivision, they are submitted to the requisite departments of the parish in which the subdivision is located. These departments must give their initial approval of the plans, or make the necessary corrections, before development can begin. *155 When such development nears completion, the departments make final site inspection and then give their recommendation to the Parish Council whether such development should be given final acceptance by the Parish. Bayou Estates was accepted by the Parish, Resolution No. 14392, on April 10, 1969. The Harris extension plans were not drawn until March 14, 1971, approximately two years later.
The requisite departments with which we are concerned are the Department of Drainage and the Department of Roads and Bridges. The Harris plans were initially approved by both departments on July 15, 1971. Acceptance of Coubra from Caddy to Sauvage was recommended by Roads and Bridges on December 27, 1971, and by the Department of Drainage on December 2, 1971. The Parish Council, by Resolution No. 19391, made final acceptance of Coubra Drive on January 6, 1972.
In 1971, Ross Ketchum was the director of Roads and Bridges and Julian Wenn, his assistant, was in charge of the engineering division. Ketchum testified that Wenn would review all subdivision construction plans for him and would advise. Unless notified of problems, Ketchum would sign on Wenn's recommendation. Ketchum signed the Harris plans on Wenn's recommendation but stated he did not review them in any detail nor discuss them with Wenn.
Ketchum further testified that, at the time he signed Harris's plans, he was not aware they called for the streets to be 18 inches lower. However, according to Ketchum, a difference of 18 inches was not unusual and the Harris plans did not reveal this difference because they did not show the elevations where the extension streets were to tie in with the older Bayou Estates streets. In fact, the Krebs's and Harris's plans were not suspect when read separately; and, even when read together, the different elevations could be explained away by use of different benchmarks. Ketchum further stated that since the Harris plans showed no steep grade or drop-off, the possibility of different benchmarks was likely.
Although he stated an 18 inch drop-off was not unusual, he would have been concerned enough to shut the project down. Ketchum further stated he would then have held a discussion with Wenn and Ray Condon, Director of Drainage, to work out a drainage plan involving extra pumps; or, if necessary, make Regent tear the street out and build it at a higher level.
Setting street elevations was not the responsibility of the Department of Roads and Bridges according to Ketchum. He stated that the Department of Drainage was responsible for street elevations because they ran the pumping stations and had control over the maximum water elevation during storms. Ketchum disagreed with Ray Condon and stated emphatically there was no agreement between his department, Roads and Bridges, and Drainage (Ray Condon); that for an unspecified time Roads and Bridges would have responsibility for setting street elevations. Ketchum acknowledged however that his department did, for a while, take responsibility from Drainage for most of the on-site inspection of subsurface drainage during construction because Drainage was shorthanded.
Julian Wenn testified that there was an agreement between Roads and Bridges and Drainage, "a short of Parish joint venture", whereby authority for street elevations transferred to Roads and Bridges. Wenn further stated that, although he was aware of the lower street elevations, he did recommend approval of the Harris plans, but only because Ray Condon had given him verbal assurance additional pumping capacity would be forthcoming to that area. Wenn could not remember, however, how Condon proposed to increase the capacity, i.e., number, size or location of pumps.
Ray L. Condon, Director of Drainage, stated that his department was responsible for the maintenance of existing ditches, canals and pump stations. Condon was advised by his assistant, Walter Frey, who was with the Department of Sanitation *156 (Sewerage). Frey was responsible for reviewing proposed new subdivision plans and making recommendations to Condon regarding their adequacy. Condon testified he was not aware of the 18 inch difference in the street elevations and that Frey had signed his name to the department's letter of approval concerning the extension. Although Condon recalled that Frey did not discuss the Harris plans with him before signing, he stated that Frey could not have signed his name without his knowledge.
As to street elevations, Condon testified the responsibility for setting such was with the Department of Roads and Bridges. Although he did not state whether or not there was any agreement between Roads and Bridges and Drainage, he did testify that all plans regarding surface drainage and street elevations were submitted to one departmentRoads and Bridges, as a means of expediting subdivision.
Condon additionally denied that he gave Wenn assurance of additional pumps. Condon did admit speaking to Wenn once concerning the Harris plans, but in that instance he referred Wenn to Frey.
Walter Frey was Condon's assistant; and, although his job was to review submitted proposed plans, he was mainly concerned with sewerage. At trial Frey could not recall the Harris plans or any conversations with either Julian Wenn or Rene Harris. Frey further stated that he did not set any street elevations nor was he responsible for doing so.
From the testimony of the above witnesses, it is evident that there was much confusion regarding the responsibility of setting street elevations. However, we note that while none of the various departments took responsibility for setting street elevations, the criteria for establishing street elevations was never clearly defined as well as what the minimum elevation that a street could be. No one at trial or on appeal has been able to point to any positive law which clearly places the burden or duty upon the Parish of establishing a minimum elevation that a street must be. It is clear from the record that there was no such requirement. In fact, Joseph Krebs explained it best when he said the Parish did not set the minimum elevation, but that the one who drew the plans did, and then at best it was a judgment call. The only role the Parish had, as to street elevations, was to evaluate and approve them as set by the designing engineer.
The Parish did require that house slabs be a minimum of 18 inches higher than the street. This does not however set an absolute minimum height as there is no absolute minimum street elevation upon which the slab height is based. Bayou Estates Extension was a Federal Housing Authority (FHA) 235 Project. The FHA required, in 235 projects, that all slabs be a minimum of 23.43 CD (or 3 feet above mean sea level). In order to obtain flood insurance, through National Flood Insurance Association[4], a slab had to be 22.43 CD[5] (2 feet above mean sea level).
During construction, Joseph Varisco, a civil engineer employed by Rene Harris and Associates, had his crew take slab elevations. He found the average slab height on Coubra Drive to be 23.11 CD, 3 inches lower than the 23.43 CD required by the FHA. In response to his findings, Varisco wrote a letter, dated December 5, 1972, to Mr. James Salvant (Assistant Director, Single Family Branch, FHA), regarding the slab heights and requesting a variance. Varisco, in his letter, advised the FHA that the Parish had allowed the street elevation to be lower by 18 inches due to drainage *157 improvements; and thus the slabs were lowered accordingly.
Mr. John Schmidt, Chief of the FHA's local Evaluation Branch, was the acting director of Housing Production at the time of the trial. He testified even though no response to Varisco's letter was in evidence,[6] that since the loans were made the FHA found the slab variance acceptable. Although Schmidt thought it unusual for a contractor to pour a slab 3 inches less than the known minimum requirement, he nevertheless testified that it would not be unheard of for the FHA to grant a small variance and continue ahead with the commitment.
To this point, we have discussed the problems of lowered street and slab elevations. These problems, however, were further compounded by the soil subsidence of the area. Appellees urge that the subsidence experienced in the Bayou Estates Extension exceeded all expectations and was not due entirely to natural causes.
Charles Julian, an engineering inspector with Roads and Bridges at the time the Extension development was being built, was the Parish representative on the job site to see that the job was built in accordance with submitted plans and specifications. When first arriving at the job site, he found what he described as a large hole (pit) dug where Coubra Drive was to be built. According to Julian, trees were buried in the pit; and, although he knew the pit to be wide, he was not sure it extended all the way back to where the slabs were to be built. It is also important to note that while the submitted plans call for Coubra Drive to be approximately 150 yards in length, Julian was never questioned as to the length of the pit.
Julian spoke with Bud Finkenauer, Regent's contractor, and informed him the trees were improper fill and would have to be removed and the pit area filled with sand. Julian testified that Finkenauer told him the trees would not be removed. Julian reported this to his immediate supervisor, Julian Wenn, because of his concern of obvious subsidence problems.
Charles Julian went on to state that Wenn informed him Regent would compensate by using a 7 inch concrete street slab rather than the required 6 inch slab. Although Julian testified that to the best of his recollection the trees were never removed prior to paving, on cross-examination, however, he stated he did not know for a fact the trees had not been removed. He did testify though that on a subsequent visit to the site he witnessed the contractor cutting out trees while attempting to lay a sewer line.
Mr. Hennessey stated that it was not unusual when clearing land with a bulldozer not to be able to remove all organic material from the ground. He further stated that as trees are bulldozed down, limbs and branches often break off and that they tend to get buried in the process of clearing. Hennessey went on to state that his company would not have built house slabs on a ground surface that contains trees or other organic matter underneath. Hennessey believed that ground containing such organic matter was not the proper soil necessary to support the kind of non-pile supported slabs Regent was using.[7] He stated, however, that Regent had not performed any subsoil analysis in the Extension area as such was not required because some soil analysis and bore testing had been done in Bayou Estates in compliance with what Hennessey called a "pretty liberal requirement."
*158 On August 1, 1978, a comprehensive subsoil investigation was conducted on Coubra Drive by Eustis Engineering Company.[8] A purpose of the investigation was to determine the suitability of the subsoils for support of residential "slab-on-grade" foundations. Under the Foundation Analysis section, the report concluded:
"Past experience indicates that miscellaneous fill materials similar to those encountered at Borings 1, 2, 3 and 7 are unpredictable and unreliable. Because of the void spaces that are inherent during placement of these materials and their future deterioration, large settlements and/or differential settlements are probable. It is our opinion that miscellaneous fill materials are not suitable for support of residential `slab-on-grade' foundations and that considerable risks are involved when this type foundation is situated above miscellaneous fills without piling."
The report, however, also concluded:
"It is our opinion that the subsoils encountered at Borings 4, 5 and 6 are adequate for support of residential "slab-on-grade" foundations without piling. It is estimated that the ultimate settlement of residential foundations at these locations may be on the order of 1.0 to 1.5 inches."[9] (Emphasis added)
Hennessey testified that he was not aware of possible problems as outlined by the subsoil analysis report. He stated that he initially became aware of the detrimental soil conditions as outlined by the report, shortly before taking the witness stand. When pressed, however, Hennessey said he had been aware of the problems but only after all of the houses on Coubra Drive had been built. In fact, Hennessey knew of problems as early as 1973 when Regent had to restabilize three slabs that were already beginning to experience settling.
Appellees argue that not only were the extension streets originally designed to be 18 inches lower than Bayou Estates, but that because of the fill problem they subsided another foot to foot and one-half making the extension a total of 32 to 34 inches lower. A subsidence of that magnitude is neither factual nor supported by the record.
The Krebs plans called for Glasco to range from a high of 22.9 CD to a low of 22.4 CD. The Harris plans designed Coubra to range from a high of 21.5 to a low of 20.9; a difference of approximately 18 inches.
In October of 1973, Emile Cloutet, an instrument party man chief with the Department of Roads and Bridges, was instructed by Wenn to conduct surveys of the extension area, in particular Coubra Drive. For an accurate comparison of the difference in elevation, he surveyed the following intersections:

Caddy & Glasco  21.57 CD
Caddy & Coubra  19.96 CD
Sauvage & Glasco  21.55 CD
Sauvage & Coubra  19.79 CD

The actual difference still remained approximately 19 inches; and, according to Cloutet, he did not survey for the highest points, but only these intersections. For these elevations, Cloutet established his own benchmark on the top of a walkway on the southeast corner of the bridge crossing the Eighty Arpent Canal at Caddy Drive. His benchmark was based on the U.S. Coast and Geodetic Bench Mark designation T-190. Cloutet stated that he did not *159 know the benchmarks used by any prior surveyors.
On March 3, 1975, Cloutet returned to Coubra Drive to survey the center line as per Wenn's instructions. He found the elevations along the center line of Coubra Drive to range from a high of 20.25 CD to a low of 19.61. These elevations were arrived at using the original U.S.C.G. & S.T-190 benchmark.
Counsel for appellees' contention that the true difference in elevation is 32 to 34 inches is baseless. It appears from the record that the subsidence on Glasco and Coubra was approximately 1½ inches as accurately predicted by the Gillen and Eustis reports. Regardless of the economic questions concerning the substitution of organic matter as fill instead of sand, the settlement experienced on Coubra Drive was within the projected limits; and therefore cannot be attributed to either defendant.
The one remaining factor to be examined is pumping capacity. Keeping in mind that the pumping capacity of the Ames district in 1968 was 324 cubic feet/second (CFS), we look to see what improvements were made and whether those improvements, if any, could have prevented the damage complained of.
Ronald P. Saucier, Drainage Superintendent III (in 1971), testified that one 30 inch lift pump was installed at Bayou Estates in October, 1971. This pump became operational two months later. The Parish had originally planned to place twin 30 inch lift pumps at Bayou Estates, but according to Saucier one was stopped due to the intervention of the Environmental Protection Agency. However, the second pump was later installed and made operational prior to May, 1978, and gave the Bayou Estates pumping station capacity of 22,000 gallons per minute (GPM).
In 1979, the pumping capacity at Bayou Estates was again increased. According to Saucier, the props on the pumps were changed for new ones that had better pitch and the electric motor horsepower of each pump was increased from 75 to 150. These changes resulted in an increase of capacity from 22,000 GPM to 27,200 GPM.
In 1977, Peter J. Russo became the acting director of Drainage, replacing Condon. In February, 1978, he began increasing Ames district pumping capacity by attempting to bring Mount Kennedy and Orleans Village pumping stations on line. During the May 3, 1978 deluge, the Ames, Bayou Estates and Orleans Village pumping stations were on line with a combined pumping capacity of 260,000 GPM provided all pumps were working. However, on May 3, 1978, one pump located at the Ames pumping station was down, thus reducing this capacity somewhat.
Saucier explained that although the Mount Kennedy pumping came on line and was later improved to the status of four pumps, the responsibility for draining the Bayou Estates Extension primarily remained with the same pumping stations as in 1978Ames, Bayou Estates and Orleans Village. Prior to the April, 1982 inundations, however, improvements in these three stations had increased pumping capacity from 260,000 GPM in 1978 to 311,000 GPM. Besides the already mentioned improvements to the Bayou Estates pumping station, by April, 1982, one additional pump had been added at Bayou Estates and Orleans Village. During April 24 and 25, 1982, all pumps at each of these stations were working.
Charles Eagan, Jr., Chairman of the Jefferson Parish Council in 1971 and 1972, testified plans were made to try to solve drainage problems as expeditiously as possible. Due to the serious nature of those problems, they were given top priority. Eagan stated that it seemed to him the Council was always attempting to pass bond issues to solve these problems. However, once an issue passed the council, it would then be seriously delayed by environmentalists, Corps of Engineers or ultimately voted down by the Parish electorate.
Peter Russo recalled only one bond issue passing during the time in question, specifically *160 1973, for the relocation of the Ames pumping station as recommended by the Fromherz Report. Although the issue passed, relocation of the station could not be accomplished because of the inability to obtain a permit from the Corps of Engineers by virtue of the opposition asserted by the EPA. These monies had to be placed in escrow and dedicated. Condon corroborated Russo's testimony and stated further, at the time of trial, that he believed the money was still in escrow.
In 1980, an Eighty Million Dollar ($80,000,000) bond issue passed parish-wide. This bond issue was specifically targeted for improving east and west bank pumping stations and did not include any improvement to the canals, canal linings or encasements. Even with the passage of an Eighty Million Dollar bond issue, the only improvement provided to the Ames drainage district was the proposed increase in pump capacity at the Ames station from 300 CFS to 1800 CFS. This is simply because the issue was parish-wide. With Eighty Million Dollars available, Russo testified the Parish could not improve the system to provide protection against a storm with a return frequency of 100 years.
The Parish has always been confronted with the many restraints of the political process. The Parish was, within its ability, making good faith efforts to increase the Ames district pumping capacity in an attempt to alleviate or minimize home and street flooding. The evidence, in particular Exhibit F-13, supports the Parish's precarious position as articulated by Eagan, Russo and Condon. The flooding of houses located on Coubra Drive cannot be attributed to any negligence on the part of the Parish in regard to the Ames district pumping capacity or the Parish's attempts to increase it.
On May 3, 1978, a total of 13.5 inches of rain fell within a 24 hour period, 11 inches of that rain fell within three hours. During April 24 and 25, 1982, 13.08 inches of rain fell, 12.92 inches of that rain fell during a ten hour period. Both rains far exceeded all expectations of a 100 year flood. Both experts, Herbert Miller, Civil Engineer whose specialty was the field of hydrology, and Doan Modianos, Specialty Engineer in the field of drainage, testified uncontradicted as to the intensity and magnitude of these storms.
Mr. Miller testified he was very familiar with the topography of the Ames Drainage District. He stated that in cases such as this where there is such a high intensity rainfall, the fact that the land is either developed or undeveloped makes very little difference in the volume of runoff that is going to occur. He stated further rains of these intensities are simply going to run off almost totally because saturation occurred within the first few hours; and in April, 1982, within the first hour. Because of this early ground saturation, Miller asserted that, "a great, great majority, probably over 90 percent would continue to run off."
As already mentioned, the Ames Drainage District consists of 3,223.85 acres; and on May 3, 1978 was drained by the Ames, Bayou Estates and Orleans Village pumping stations with a combined pumping capacity of 260,000 GPM. Feeding the aforementioned information into a computer, Mr. Miller was able to determine what the level of the water would have been in the Bayou Estates area, particularly Coubra Drive, under varying pumping capacities at the peak of the flooding on May 3, 1978. Miller calculated that, considering the above pumping capacity reduced by one Ames pump being inoperable, the water would have reached 23.5 CD (a little over 3 feet above sea level). This estimate was corroborated by the testimony of Sidney Osborne who, in 1978, was a heavy equipment operator for the Drainage department. On May 3, 1978, Osborne was assigned to the Bayou Estates pumping station. The record contains flood readings taken at the Bayou Estates Station. These recordings began May 2, 1978 at 12:30 p.m. and ended May 7, 1978 at 6 p.m. According to these readings, the water reached 24 CD by 4 p.m. on May 3, 1978; then 23.5 CD at 7 a.m. on May 4, 1978; and remained above *161 sea level (20.43 CD) until sometime between 7 p.m. and midnight on the night of May 5, 1978.[10]
Miller stated that if all pumps, including both pumps at the Ames pumping station, had been in operation on May 3, 1978, the amount of water in the Bayou Estates area, in particular Coubra Drive, would have been, "almost identical to that that would have occurred with the one pump out at the Ames Station." This was due, he concluded, to the tremendous intensity of the storm and the resultant runoff it produced.
The Fromherz report suggested the Ames district pumping capacity should be increased to 1000 CFS within 3 to 5 years, by 1971-73, and eventually increased to 2000 CFS within 15 years, by 1983. Miller calculated that if, on May 3, 1978, the Ames district pumping capacity had been tripled (1733.28 CFS), the water still would have reached a height of 22.93 CD (2½ feet above sea level). Again, Miller calculated that if, on May 3, 1978, the pumping capacity had been quintupled (2888.3 CFS), the water would still have attained a height of 22.68 CD (somewhere between 2 feet and 2¼ feet).
As for the April, 1982 flooding, Miller calculated that water reached a height of somewhere between 22.5 CD and 23.5 CD in the Bayou Estates area (somewhere between 2 feet and 3 feet, "possibly a little higher than two and a half feetsomewhere in that vicinity"). Again this height of water was due to the intensity of the rainfall causing early ground saturation and resultant runoff. In April, 1982, the Ames district pumping capacity had been increased to approximately 700 CFS. Miller calculated that if that capacity had been tripled (about 2080 CFS), the water in the area in question would have reached a height of 22.43 CD (2 feet above sea level). Had the pumping capacity been quintupled (about 3465 CFS), the water would have reached between 21.43 CD and 22.43 CD (somewhere between 1 feet and 2 feet above sea level, "probably closer to one foot, around one point two, one point three feet above mean sea level").
The record glaringly establishes that even if the Coubra Drive street and slabs had been built to the height plaintiffs-appellees suggest should be required as a minimum, and even had the Ames district pumping capacity been tripled or even quintupled during the inundations of May, 1978 and April, 1982, the inescapable conclusion is that these Coubra Drive houses would have experienced flooding.
Various witnesses testified to the extent of home flooding which occurred throughout Jefferson and Orleans Parishes. Areas that had never before experienced flooding did so as a result of these rains. In particular, close to Bayou Estates Extension, there was flooding in the homes of Golden Heights and Greenbriar subdivisions.
Miller emphatically stated that there is no drainage system in the United States that is designed to handle the rainfall of a storm with the return frequency of 100 years (100 year flood). Fromherz's projected 25 year master plan only calls for a drainage system capable of handling 5¾ inches in 24 hours, which is statistically equivalent to a storm with a return frequency of only two years. With the recent passage of the new Eighty Million Dollar bond issue dedicated exclusively to drainage, the Parish has been able to upgrade the Parish's drainage districts to a design capable of handling nine inches in a 24 hour period. Statistically, this is a storm with a return frequency of ten years. Miller's uncontradicted testimony was supported by Condon, Russo and Modianos. Condon stated he knew of no system anywhere that could handle a 100 year storm; and Russo testified he knew of no drainage system in the world that could have handled the rains of May, 1978 and April, 1982. Frank Fromherz *162 perhaps summed it up best when he concluded, "Most all of the things we recommended in this report, if accomplished, wouldn't have made a difference."
Rector, supra, stated that the negligence concurring with an "act of God" must be a proximate cause of the injury. Even where there is negligence, unless that negligence is a proximate cause of the injury, it is not actionable. Under duty risk, the first criteria to be established is that the negligence was a cause-in-fact of the injury. The Louisiana Supreme Court stated in Dixie Drive It Yourself Systems v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962):
"Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Under the circumstances of this case, the negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it. A cause-in-fact is a necessary antecedent. If the collision would have occurred irrespective of the negligence of the driver of the R.C. Cola truck, then his negligence was not a substantial factor or cause in fact."
In conclusion, after a most comprehensive and exhaustive review of the record, while we can agree with the trial court that perhaps there was some negligence on the part of the defendants, especially Regent, such negligence, if any, can in no light be considered a proximate cause of the damages occasioned by plaintiff. The trial court was clearly wrong (manifestly erroneous), Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), in finding defendants liable for the damages caused by such an overwhelming "act of God."
Accordingly, for the above foregoing reasons, the judgment appealed from is hereby reversed with costs to be shared equally by all parties.
REVERSED.
NOTES
[1] Fireman's Fund was the liability insurer of the Parish but only as to the 1978 rains and flood. Travelers insured the Parish in connection with the 1982 rains and flood.
[2] 11 La.Ann. at 428:

"The term `by the act of God,' was constructed by the Superior Court of Errors and Appeals of Delaware, [McHenry v. Philadelphia, W. & B.R. Co.], 4 Har.R. 448, to mean `such inevitable accident as cannot be prevented by human care, skill, or foresight; but results from natural causes, such as lightnings and tempests, floods and inundation.'"
[3] CD is the abbreviation of Cairo datum which is a term used in engineering to express elevation. A foot is one CD and inches are expressed to the hundredth degree. Thus, 6 inches is .5 CD. For reference, mean sea level is 20.43 CD.
[4] The record contains a stipulation whereby it was acknowledged that in May, 1978, all but seven plaintiffs had flood insurance and that by April, 1982, all plaintiffs had coverage through the National Flood Insurance Association. It was further brought out that plaintiffs who had coverage received payments for the damages to their property and the contents thereof; and that their claims, relative thereto, were assigned to the National Flood Insurance Association. Jefferson Parish is presently being sued in Federal court by National Flood Insurance Association in regard to these claims.
[5] This projected slab minimum was based on the 100 year flood according to the base flood elevation map set by the Corps of Engineers.
[6] The subpoena duces tecum requesting such information was served approximately one week prior to trial. Schmidt testified that all records sought by such subpoena were in Washington, D.C. and could not be retrieved in such short notice.
[7] Regent employed Kelly slabs for all the homes they built in both Bayou Estates and the extension. A Kelly slab is a concrete foundation that is not supported by pile. Kelly slabs differ from conventional slabs in that there is a cable system installed at the time the slab is formed. These cables are tensioned before the concrete is poured and then again several days later after the concrete is given time to dry somewhat.
[8] This investigation was authorized by Parish Resolution No. 33593 adopted June 21, 1978.
[9] Gillen Engineering Co., Inc. prepared a Subsoil Investigation Report of Bayou Estates, dated January 22, 1970, pursuant to the subsurface bore testing they conducted. The report states: "Foundation Analysis One five foot soil boring was made on every lot in square F and square E lots 17 through 32. Results of our tests indicate that a post tension slab (Kelly System) placed on fill material as tabulated below will develop a factor of safety of three against a shear failure in the soil and long term settlement will be less than 1.0 inches. With this post tension slab, no differential settlement is expected." (Emphasis added)

This report was corroborated by the testimony of Joseph Krebs.
[10] These flood recordings, if any, were not introduced for the rains of April, 1982. Sidney Osborne was working at the Ames pumping station in 1982.